**UNITED STATES of America,**
**Plaintiff(s),**

v.

**Tracy D. MASON, Defendant(s).**

**No.  CIV.  A.  01–7004M.**

United States District Court,
D.  Colorado.

April 11, 2001.

Daniel Geoffrey Osgood Kay, Daniel G. Kay, Colorado Springs, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

COAN, United States Magistrate Judge.

This matter was before the Court for trial in Colorado Springs on April 5, 2001. The prosecution was represented by Robert J. Mullins II, Special Assistant United States Attorney, and defendant was represented by Daniel G. Kay, attorney at law. Defendant, through his counsel, filed three

motions to suppress evidence, which motions were heard on April 4 and 5, 2001 in Colorado Springs, Colorado. The Court denied the motions to suppress on the record on April 5, 2001. Following trial, the Court took the matter under advisement.

## I.

The prosecution presented the testimony of Specialist Jason G. Baccus, Staff Sergeant Shawn M. Harris, Private First Class Hendrickson, Sergeant Jerry Thornton and Melissa Cobb, who was qualified as an expert in the methodology of testing blood for alcohol content. Mr. Mason testified, as did his expert witness, Patricia Sulik, who was qualified as an expert in analytical chemistry and toxicology. The United States' exhibits 1, 4, 5, 6, 7, and 8 and defendant's exhibits A, B, C, D, F, G, and H were admitted into evidence.

The evidence presented at trial established the following. On October 10, 2000, Mr. Mason and his friend Anna Stanley spent several hours at a local bar, drinking and playing pool. Mason testified that he had consumed two beers[1], that Stanley was drunk and that he was not.

The parties stipulated that defendant then operated a motor vehicle and that Mr. Mason was stopped at Gate 20 on the Fort Carson military installation, which is within the special maritime and territorial jurisdiction of the United States. PFC Hendrickson stopped the black Dodge Avenger Mr. Mason was driving, and in which Stanley was a passenger, at approximately 12:10 a.m. on October 10, 2000. 100% of the vehicles entering Fort Carson at that gate were stopped on October 10, 2000 to check vehicle and driver identification and to de-

---

1. Mason testified that he had "two pitchers" of beer and then corrected his testimony to "two beers."

termine whether drivers had been drinking.

When Hendrickson asked for Mason's identification, he noticed a strong odor of alcohol coming from inside the vehicle. He asked Mason to step out of the vehicle to the guard shack. Hendrickson testified that Mason had trouble keeping his balance, and placed his hand against the vehicle door and on the vehicle to keep his balance. Because he suspected that Mason had been drinking and driving, Hendrickson began to escort Mason to the visitor center, a well lit, level area. The parties stipulated that Hendrickson asked Staff Sergeant Harris to help administer field sobriety tests and that Harris did administer field sobriety tests in the visitors' center. Hendrickson observed that a strong odor of alcohol emanated from Mason, his balance was not good, Mason's eyes were red and glassy, and that Mason was probably scared and nervous.

Harris identified Mason at trial. Harris testified that he had been trained and was experienced in field sobriety test administration. Harris said that he helped Hendrickson escort Mason to the visitor center, that Mason's eyes were red, and that Mason smelled of alcohol and staggered slightly. Harris stated that Mason appeared nervous, and that his speech was mumbled and thick tongued. See also Government Ex. 1. Harris told Mason that due to the smell of alcohol and Mason's staggering, Harris wanted to administer field sobriety tests to determine whether Mason had been drinking. When Harris asked for Mason's consent, Mason said he had been drinking.

Harris explained and demonstrated the field sobriety tests to Mason, and said he had to repeat the directions. Harris then administered the finger to nose, walk and turn and stand and balance tests. Harris stated that Mason started too soon and failed to touch his finger to his nose even though given three tries for each hand, failing the test. On the walk and turn test, Harris observed that Mason failed to maintain heel to toe contact more than 50% of the time, failed to perform the requisite number of steps and stopped during the test. Mason failed this test. Harris next administered the stand and balance test. Harris testified that Mason was swaying and counting to himself as he attempted the test, which he also failed. See also Government Ex. 1.

The parties stipulated that: Mason was apprehended, which is the military term for arrested, and transported to the Provost Marshall's Office, where Sergeant Thornton advised Mason of his "Implied Consent to Certain Tests"; Mason signed the implied consent form, electing a blood test. The parties further stipulated that Mason did not consume any alcohol from the time he was pulled through to the time his blood was drawn.

At approximately 2:00 a.m. on October 10, 2000, Specialist Baccus, a medic, used a sterile "legal blood draw" kit to draw Mason's blood. Baccus testified he swabbed the area with iodine, used an 18 gauge needle and withdrew two vials of Mason's blood, which he sealed. He then verified with Mason his name, social security number, and that the vials were sealed. Baccus placed the vials in a bio-hazard bag with a chain of custody document and released them to Specialist Harris, the evidence custodian.

On October 16, 2000, Melissa Cobb retrieved the Mason vials from the lock box in the refrigerator at Evans Community hospital, verified the name and social security number, and verified that the evidence tape was intact. See Government Ex. 4. She then placed one of the vials in her pocket, centrifuged the other vial, and, using the Dade Dimension RAL Analyzer ("Dade"), said that she tested Mason's

whole blood or serum sample and found it to contain 0.086 grams of alcohol per 100 milliliters of blood. Government Ex. 8, p. 2. Cobb was qualified to operate the Dade, which she testified, is generally accepted in the industry, and was in proper working order.

Mason's expert, Patricia Sulik, testified that she is an·associate director of Rocky Mountain Laboratories in Fort Collins, Colorado. The laboratory has been certified by the Colorado Department of Health. Sulik received a tube of whole blood which was cracked from Evans Community Hospital by federal express air bill. She stated that the vial she received did not have the sodium fluoride concentration marked on the vial. Sulik stated that if the blood cells are not distributed evenly through a serum sample, the alcohol content in separated serum can be as much as 20% higher than the whole blood content. She said that testing whole blood is more accurate but that serum can also be tested accurately. When Sulik, using a gas chromatograph, tested the vial of Mason's blood, she found the alcohol content to be 0.064 grams of alcohol per 100 milliliters of blood. Sulik said that because there was a 25% difference between her result and Cobb's result, she had questions as to the accuracy of both samples, and that she was not sure that either sample reflected the defendant's blood alcohol content.

Mason was charged by information with driving a vehicle while his ability was impaired in violation of Title 18, U.S.C., § 13, incorporating Colo.Rev.Stat. § 42–4–1301(1)(b), a Class B misdemeanor. *See* January 24, 2001 Information. He pled not guilty to the charge.

## II.

■ On October 10, 2000 in the early morning hours, 100% of the vehicles entering Fort Carson were stopped before being granted permission to proceed onto the post. A 100% stop means that the military installation is "closed," so that any vehicle given permission to enter the installation may be searched without probable cause. *See United States v. Vaughan,* 475 F.2d 1262 (10th Cir.1973). Hendrickson had probable cause to ask that Mason exit his vehicle due to the strong smell of alcohol coming from the vehicle. *See United States v. Santiago,* 846 F.Supp. 1486 (D.Wyo.1994). When Hendrickson and Harris determined that Mason smelled strongly of alcohol, staggered slightly, had red eyes and mumbled speech, and heard him state that he had been drinking, they had probable cause to administer field sobriety tests. When Mason failed the field sobriety tests, there was probable cause to ask Mason for his consent to a blood alcohol test.[2]

---

2. The federal consent statute, 18 U.S.C. § 3118 reads as follows:

(a) Consent.—Whoever operates a motor vehicle in the special maritime or territorial jurisdiction of the United States consents thereby to a chemical test or tests of such person's blood, breath, or urine, if arrested for any offense arising from such person's driving while under the influence of a drug or alcohol in such jurisdiction. The test or tests shall be administered upon the request of a police officer having reasonable grounds to believe the person arrested to have been driving a motor vehicle upon the special maritime and territorial jurisdiction of the United States while under the influence of drugs or alcohol in violation of the laws of a State, territory, possession, or district...

This Court has found this federal implied consent applicable to all federal property. *See United States v. Love,* 141 F.R.D. 315 (D.Colo. 1992). Colorado's "express consent" statute at § 42–4–1301(7)(a)(I) and (II)(A), Colo.Rev. Stat. (2000) has been held not to apply to federal property. *See United States v. Hopp,* 943 F.Supp. 1313 (D.Colo.1996).

Mason is African American and of slight build. He stated that he was not afraid of being stopped at the gate because he had been stopped before. He maintained that: he did not pass the field sobriety tests because he has known people who have been "yanked around" by police, the military police escorting him were very close to him; the visitor center space was small and he felt closed in; and, he was nervous and scared of Hendrickson and Harris who seemed "humongous" to him. He acknowledged on cross examination that no one threatened or tried to intimidate him.

The Court finds that Mason was incredible when he testified that he was so afraid of the military police that he failed the roadside sobriety tests. Even if plaintiff was afraid of the military police and failed the roadside sobriety tests solely because of his fear, there was other significant evidence of Mason's impairment by alcohol including his slurred speech, his red eyes, his using the vehicle to steady his balance, his admission he had been drinking, and the results of two blood tests, which showed a blood alcohol level of 0.064 to 0.086 Gms/100ml of blood.

■■■ Mason also argued that the chain of custody of his vials of blood had not been maintained. The concept of a chain of custody of evidence is to ensure that evidence is not lost, adulterated, or changed pending trial on the merits of a case. Where evidence "is unique, readily identifiable, and resistant to change, then the foundation for consideration of evidence must support what its proponent claims the evidence to be." *See United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir.1989). Where the chain of custody is imperfect, "deficiencies in the chain of custody go to the weight of the evidence, not its admissibility; once admitted, the jury evaluates the defects and, based on its evaluation, may accept or disregard the evidence." *Id.*

The testimony was that Baccus drew Mason's blood into two vials, which he sealed and verified with Mason. Baccus then gave the vials to Harris, an evidence custodian. There was no testimony about what Harris did with the vials. There was, however, testimony that Cobb took the vials out of the laboratory refrigerator and that the evidence seal had not been broken. The Court concludes from the evidence that Harris placed the vials in the laboratory refrigerator's lock box, where they remained until Cobb retrieved them. If the vials had been tampered with, the evidence tape would not have been in place, as Cobb testified. And, if the vials had not been placed in the refrigerator, Cobb testified that the blood alcohol level would have been higher because the blood would have evaporated to some extent. The Court finds sufficient evidence that the chain of custody was not broken and that the vials tested were indeed, Mason's blood as drawn on October 10, 2000.

■■■ Mason also contends that the second vial of blood sent to his expert's laboratory for testing was not marked as containing 0.9% sodium fluoride, was not inverted to mix the sodium fluoride with blood, and not refrigerated as required by Colorado Department of Health regulations. *See* Defendant's Exhibit A, at 1.3.1.2: 1.3.1.3.1.1 and 1.2 and 1.3.1.3.1.4. To support his contention, Mason offered the testimony of Sulik, who said that the vial which had been shipped to her laboratory was cracked, partially frozen and did not contain the 0.9% sodium fluoride sticker Cobb testified to. *See* Exhibit G.

The Tenth Circuit has held that, despite claims of failure to calibrate, jostling of the machine, and failure to obtain a split sample for later testing, if the method of testing a breath sample is generally accepted in the scientific community, consideration of the evidence goes to its weight, not its admissibility. *See United States v. Smith,*

776 F.2d 892, 898 (10th Cir.1985); *see also People v. Bowers,* 716 P.2d 471 (Colo. 1986)(strict compliance with Department of Health regulations does not invalidate otherwise valid and reliable testing methods). Here, while Sulik said the gas chromatography analyzer she used was a generally accepted method of testing blood, she also testified that the Dade analyzer Cobb used was reliable for testing serum. Further, while there was testimony that the presence of sodium fluoride might hemolyze some red blood cells, no evidence was presented to show what effect varying amounts of sodium fluoride had on the accuracy of blood test results. Even though the test vial was cracked, and did not identify the amount of sodium fluoride, Sulik did not testify that these alleged defects altered her test results. Cobb testified that she was a person qualified to run the Dade analyzer, and that the machine was in good working order, had been calibrated, and had been tested for quality control. See Government Exs 5–8. The Court thus finds that Cobb's testimony and the test results meet the *Bowers* criteria.

Mason argued that both blood tests should be thrown out because of the "25%" variance between the first and second blood alcohol test results. It is undisputed that Cobb's test result was 0.086 Gms, while Sulik's was 0.064 Gms and that both experts had results above 0.05 Gms. Sulik did not testify unequivocally that both tests were invalid, but only that she had "questions" about the validity of either test.

A 20% rule was discussed in *Charnes v. Robinson,* 772 P.2d 62 (Colo.1989), where the Colorado Supreme Court invalidated a 20% rule, used by a hearing officer to revoke a driver's license, for the failure to comply with the requirements of administrative rulemaking. The *Charnes* court nonetheless upheld the revocation based on split sample blood test results within 20% of each other as not arbitrary and capricious. There, the court noted that the expert testified that a test result within a 20% variance of the first test result *validated* the first test result. That expert did not say, as did Sulik, that the variance rendered both results "questionable."

After considering Sulik's testimony and the *Charnes* case, the court finds that Sulik's testimony that both tests were "questionable" does not equate to defense counsel's suggestion that neither test result should be considered. Instead, the Court finds that the second test does not invalidate the first test, but leads only to the conclusion that Mason's blood alcohol on October 10, 2000 was *at least* 0.064 Gms per 100 milliliters of blood. The Court finds that, based on the test administered by his own expert, Mason's blood alcohol level six days after the events at issue, was 0.064%, slightly above the 0.05% level of presumptive impaired ability. *See* § 42–4–1301(5)(b), Colo.Rev.Stat. (2000).

### III.

"Driving while ability impaired' means driving a vehicle when a person has consumed alcohol ... which ... *affects the person to the slightest degree* ... in the safe operation of a vehicle." § 42–4–1301(1)(g), Colo.Rev.Stat. (Emphasis added).

The Court finds that the prosecution has met the elements of the charge as contained in the Information. It is undisputed that Tracy Mason was operating a motor vehicle when he drove through Gate 20 on Fort Carson on October 10, 2000 and that the Fort is within the special and maritime jurisdiction of the United States. Mason admitted he had been drinking with his friend, Anna Stanley. Mason emanated the odor of alcohol, was red eyed, had slurred speech, admitted he had been drinking, and had a blood alcohol level of

at least 0.064 Grams of alcohol per 100 milliliters of blood, giving rise to the presumption that his ability to operate a motor vehicle was impaired by alcohol. See § 42–4–1301(5)(b), Colo.Rev.Stat. (2000). That presumption was not rebutted by defendant's evidence; indeed, even if Mason was not observed driving erratically, and even if he failed the field sobriety tests because he was afraid, there was significant other evidence of his impairment due to alcohol. Accordingly, IT IS **ORDERED** that defendant Tracy Mason is found guilty as charged in the Information of driving on October 10, 2000 while his ability was impaired by alcohol within the meaning of 42–4–1301(1)(b), Colo.Rev.Stat. (2000), as made applicable by 18 U.S.C. §§ 13 to the Fort Carson United States Military Installation. It is FURTHER **ORDERED** that the deputy clerk shall set this matter for sentencing on June 6, 2001 at 10:00 a.m.