Deaundrey Laval **WOOTEN**, Appellant

v.

The **STATE** of Texas, Appellee.

Nos. 14–07–00129–CR, 14–07–00130–CR, 14–07–00131–CR.

Court of Appeals of Texas, Houston (14th Dist.).

July 22, 2008.

Crespin Michael Linton, Houston, TX, for appellants.

Eric Kugler, Houston, TX, for State.

Panel consists of Justices FOWLER, FROST, and SEYMORE.

## OPINION

KEM THOMPSON FROST, Justice.

Appellant Deaundrey Laval Wooten appeals his convictions for intoxication manslaughter, challenging the legal and factual sufficiency of the evidence and alleging error by the trial court in (1) admitting allegedly unreliable expert testimony regarding appellant's blood-test results, acci-

dent reconstruction, and drug recognition, (2) denying appellant's requested jury instruction as to criminally negligent homicide, (3) admitting appellant's statements made to medical personnel, and (4) denying appellant's motion to quash an enhancement paragraph in the indictment. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On a street in front of a bar, several people witnessed a gold-colored vehicle driven by appellant speed down the street and swerve. Appellant's car hit two pedestrians who were trying to cross the street. Both people died. Appellant also hit a parked car on the side of the road and killed a woman who was standing by that car.

Appellant's car flipped onto nearby railroad tracks and burst into flames. Appellant walked to his girlfriend's house, which was located in the vicinity of the accident. Appellant's girlfriend called 9–1–1 to summon help for the treatment of appellant's broken arm.

Paramedics examined appellant and took him to a hospital for treatment. On the way to the hospital, appellant indicated that he had been injured in a car wreck involving two Asian men in a car. Appellant alleged these men ran his car into a ditch. Appellant made statements to a paramedic about drinking alcohol that evening and smoking marijuana. Appellant also questioned the paramedic about an accident on Almeda Road, the one in which appellant was involved.

At the hospital, a nurse, at a doctor's request, took appellant's blood and urine samples for treatment purposes. Appellant's blood-alcohol level was .280 and his urine sample tested positive for marijuana and cocaine. In response to the nurse's questions during appellant's treatment, appellant revealed that he had "a little too much to drink" that evening and admitted to having used marijuana. A different nurse drew a second blood sample from appellant in the presence of a police officer, as mandated by the Texas Transportation Code.

Those who treated or encountered appellant that evening, including appellant's girlfriend, each described how his breath smelled of alcohol or how he exhibited physical attributes of a person who is intoxicated, such as slurred speech and drowsiness. Appellant's girlfriend, a nurse, and the paramedic all believed appellant was intoxicated or impaired.

Police officers determined from the tire marks on the road that appellant had not engaged his brakes before hitting the pedestrians in the street or the parked car. Tire marks indicated that the car slid into the parked car. A police officer, trained as an accident reconstructionist, determined that appellant's speed at the scene was 77 miles per hour in a 45 miles-per-hour zone.

The medical examiner determined that the complainants died of multiple blunt force injuries sustained in the collision. The legs of two complainants were severed by the bumper of appellant's vehicle. The other complainant died when he was severed at the waist after having been hit by appellant's vehicle and tossed into the air, falling through the windshield of appellant's vehicle.

Appellant was charged by indictment with three counts of intoxication manslaughter, to which he pleaded "not guilty." A jury convicted him of intoxication manslaughter on each count. The trial court sentenced appellant to forty-five years' confinement for each offense and ordered the sentences to run concurrently.

## II. Issues and Analysis

### A. Is the evidence legally and factually sufficient to support appellant's convictions?

In his first issue, appellant challenges the legal and factual sufficiency of the evidence to support his convictions for intoxication manslaughter because he alleges the State failed to prove that his intoxication caused the deaths of the deceased. Appellant also alleges that the deceased pedestrians' presence and a motorcycle severed any "but for" causal connection. Appellant points to the following evidence for support: (1) testimony that appellant lost control of his vehicle only because a motorcycle turned in front of appellant and that appellant would not have hit the complainants had appellant not swerved to avoid colliding with the motorcycle, and (2) testimony that two complainants, who were hit while standing in the center of the road, placed themselves in danger by crossing the street on foot.

In evaluating a legal-sufficiency challenge, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex.Crim.App. 2000). The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex.Crim.App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 846 (Tex.Crim. App.1991). The jury, as the trier of fact, "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex.Crim.App.1999). The jury may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex.Crim.App. 1986). When faced with conflicting evi-

dence, we presume the trier of fact resolved conflicts in favor of the prevailing party. *Turro v. State*, 867 S.W.2d 43, 47 (Tex.Crim.App.1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim.App.1997).

In contrast, when evaluating a challenge to the factual sufficiency of the evidence, we view all the evidence in a neutral light and inquire whether we are able to say, with some objective basis in the record, that a conviction is "clearly wrong" or "manifestly unjust" because the great weight and preponderance of the evidence contradicts the jury's verdict. *Watson v. State*, 204 S.W.3d 404, 414–17 (Tex.Crim. App.2006). It is not enough that this court harbor a subjective level of reasonable doubt to overturn a conviction that is founded on legally sufficient evidence, and this court cannot declare that a conflict in the evidence justifies a new trial simply because it disagrees with the jury's resolution of that conflict. *Id.* at 417. If this court determines the evidence is factually insufficient, it must explain in exactly what way it perceives the conflicting evidence greatly to preponderate against conviction. *Id.* at 414–17. Our evaluation should not intrude upon the fact-finder's role as the sole judge of the weight and credibility given to any witness's testimony. *See Fuentes*, 991 S.W.2d at 271. In conducting a factual-sufficiency review, we discuss the evidence appellant claims is most important in allegedly undermining the jury's verdict. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App.2003).

■ A person commits the offense of intoxication manslaughter if that person (1) operates a motor vehicle in a public

place, (2) while intoxicated,[1] and (3) by reason of that intoxication, causes the death of another person by accident or mistake. TEX. PENAL CODE ANN. § 49.08(a) (Vernon 2003); *Garcia v. State*, 112 S.W.3d 839, 852 (Tex.App.–Houston [14th Dist.] 2003, no pet.). It is not enough that operation of a motor vehicle, even when operated by an intoxicated person, causes death; rather, the State must prove that a defendant's intoxication caused the fatal result. *See Daniel v. State*, 577 S.W.2d 231, 233–34 (Tex.Crim.App.1979); *Glauser v. State*, 66 S.W.3d 307, 313 (Tex.App.–Houston [1st Dist.] 2000, pet. ref'd).

 In this case, evidence shows that appellant drove a motor vehicle at thirty miles over the posted speed limit on a public street. The record reflects testimony from several witnesses that while appellant was at the wheel, his vehicle swerved and collided with the three complainants. Autopsy reports indicate that the complainants died of injuries from the impact of appellant's vehicle. Appellant's girlfriend as well as a nurse and a paramedic each testified that appellant's breath smelled of alcohol. A nurse testified that appellant's slurred speech, drowsiness, and odor of alcohol showed that appellant was intoxicated or impaired. Furthermore, appellant's blood-alcohol concentration of 0.280 was more than three times the amount that constitutes intoxication in the

Penal Code. *See* TEX. PENAL CODE ANN. § 49.01(2)(B). Appellant's own admissions to treating medical personnel[2] of drinking "too much" alcohol or smoking marijuana indicate that appellant was intoxicated at the time of the accident. Finally, the record contains testimony from a law enforcement officer, who is trained in drug recognition for driving-while-intoxicated ("DWI") related investigations, that excessive speeding, failure to brake, and lack of evasive action are typical of drivers with intoxication levels similar to appellant's blood-alcohol levels, which served as one of the causes of the accident.[3]

 Appellant argues the evidence is insufficient to show that his intoxication caused the deaths because other evidence demonstrates that he swerved to avoid a motorcycle that cut him off. Under the Texas Penal Code, "a person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE ANN. § 6.04(a) (Vernon 2003); *Garcia*, 112 S.W.3d at 852. Whether such a causal connection exists is a question for the jury's determination. *See Hardie v. State*, 588 S.W.2d 936, 939 (Tex.Crim.App.1979); *Thomas v. State*,

---

1. A person is considered to be "intoxicated" if that person (1) does not have the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a narcotic, a dangerous drug, a combination of any of those substances, or any other substance into the body; or (2) has an alcohol concentration in his breath, blood, or urine of .08 or more. TEX. PENAL CODE ANN. §§ 49.01(2)(A), (B) (Vernon 2003).

2. In his fourth issue, which we address below, appellant argues that the trial court erred in admitting evidence that appellant admitted to treating medical personnel that he drank too

much alcohol that evening. However, in a sufficiency review, a reviewing court must consider all evidence, whether properly or improperly admitted at trial, that the jury was permitted to consider. *Moff v. State*, 131 S.W.3d 485, 488, 489 (Tex.Crim.App.2004).

3. In his second issue, which we address below, appellant complains of the trial court's admission of testimony from the drug-recognition expert. As noted, in a sufficiency review, we consider all evidence, whether properly or improperly admitted at trial, that the jury was permitted to consider. *Moff*, 131 S.W.3d at 488, 489.

756 S.W.2d 59, 61 (Tex.App.–Texarkana 1988, pet. ref'd). The State must prove the causal connection between appellant's intoxication and the complainants' deaths. *See Daniel,* 577 S.W.2d at 233–34; *Glauser,* 66 S.W.3d at 313. A jury may draw reasonable inferences regarding the ultimate facts from basic facts. *Lacour v. State,* 8 S.W.3d 670, 671 (Tex.Crim.App. 2000); *Garcia,* 112 S.W.3d at 853. Circumstantial evidence may be used to establish a causal connection. *Garcia,* 112 S.W.3d at 853.

■■■ "But for" causation, as referred to in section 6.04(a) of the Texas Penal Code, must be established between an accused's conduct and the resulting harm. *See Robbins v. State,* 717 S.W.2d 348, 351 (Tex.Crim.App.1986). When concurrent causes are present, the "but for" requirement is satisfied when either (1) the accused's conduct is sufficient by itself to have caused the harm; or (2) the accused's conduct coupled with another cause is sufficient to have caused the harm. *Id.* If an additional cause, other than an accused's conduct is clearly sufficient by itself to produce the result, the accused's conduct by itself is clearly insufficient, then the accused cannot be convicted. *Id.*

■■ In this case, appellant claims to have swerved to avoid colliding with a motorcycle, which he alleges breaks any chain of causation; however, the record contains witness testimony that neither a motorcycle nor pedestrians blocked appellant's passage on the street. The jury was free to believe or disbelieve any portion of the witnesses' testimony, and we presume the jury resolved conflicts in favor of the prevailing party. *See Sharp,* 707 S.W.2d at 614; *Turro,* 867 S.W.2d at 47. Moreover, even if other factors contributed in some way to the accident, these factors were not clearly sufficient to cause the fatalities in this case. *See Martinez v.*

*State,* 66 S.W.3d 467, 471 (Tex.App.–Houston [1st Dist.] 2001, pet. ref'd); *Glauser,* 66 S.W.3d at 313 (determining evidence was legally and factually sufficient to prove causation by appellant's intoxication because testimony reflected that someone in "full command of his mental and physical faculties while driving" at the rate of speed the appellant claimed to have been driving would have been able to avoid hitting the disabled vehicle).

Based on the evidence proffered by the State, a reasonable fact-finder could have found beyond a reasonable doubt that appellant operated a motor vehicle on a public street at a time when he was intoxicated, because appellant had a strong odor of alcohol on his breath and exhibited signs of intoxication, such as drowsiness and slurred speech, and he had a blood-alcohol concentration of .08 or more. *See* TEX. PENAL CODE ANN. §§ 49.08(a), 49.01(2)(B); *Garcia,* 112 S.W.3d at 854. Additionally, we hold that a fact-finder reasonably could have found that "but for" appellant's intoxication, the complainants' deaths would not have occurred. TEX. PENAL CODE ANN. §§ 6.04, 49.08(a); *Garcia,* 112 S.W.3d at 854. Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found the essential elements of intoxication manslaughter beyond a reasonable doubt. *See McDuff,* 939 S.W.2d at 614; *Wesbrook,* 29 S.W.3d at 111; *Garcia,* 112 S.W.3d at 854; *see also Adams v. State,* No. 2–05–379–CR, 2007 WL 495190, at *13 (Tex.App.–Fort Worth Feb.15, 2007, pet. ref'd) (mem. op., not designated for publication). Therefore, the evidence is legally sufficient to sustain appellant's convictions. *See Garcia,* 112 S.W.3d at 854; *Hale v. State,* 194 S.W.3d 39, 43 (Tex.App.–Texarkana 2006, no pet.); *Martinez,* 66 S.W.3d at 470; *Glauser,* 66 S.W.3d at 311; *Westbrook v. State,* 697

S.W.2d 791, 793 (Tex.App.–Dallas 1985, pet. ref'd).

Viewing the evidence in a neutral light, we are not able to say with some objective basis in the record that appellant's convictions are clearly wrong or manifestly unjust because the great weight and preponderance of the evidence contradicts the jury's verdict. See Watson, 204 S.W.3d at 417; Garcia, 112 S.W.3d at 852; Martinez, 66 S.W.3d at 471; Glauser, 66 S.W.3d at 311. We hold that the evidence is factually sufficient to support appellant's convictions. See Martinez, 66 S.W.3d at 471; Glauser, 66 S.W.3d at 311.

Because the evidence is legally and factually sufficient, we overrule appellant's first issue.

### B. Did the trial court err in admitting expert testimony regarding the results of appellant's blood test, accident reconstruction, and drug recognition?

In his second issue, appellant complains that the trial court erred in admitting expert testimony concerning the results of appellant's first blood test, the field of drug recognition, and reconstruction of the accident. Before trial, appellant filed a motion to suppress the results of the two blood samples drawn at the hospital.[4] Appellant also requested a hearing under Texas Rule of Evidence 705 for the trial court to determine the admissibility of testimony from the State's expert witnesses involving the blood samples, reconstruction of the accident, and drug recognition.

At the Rule 705 hearing, three witnesses testified as to how blood-alcohol results from a Dimension RXL Analyzer machine (hereinafter referred to as "Dimension RXL") are processed and analyzed. The Dimension RXL is manufactured by Dade and was used to perform appellant's first blood test. The trial court denied appellant's motion to suppress the blood-alcohol results from the Dimension RXL by finding the results of the machine to be reliable and determining that these witnesses could offer admissible testimony concerning the blood-test results. The trial court also deemed admissible testimony from the State's drug recognition expert concerning the effects of marijuana and alcohol in a person's body. Finally, the trial court deemed admissible expert testimony from the accident reconstructionist regarding the speed of appellant's vehicle at the time of the accident.

Under Texas Rule of Evidence 702, if a witness possesses scientific, technical, or other specialized knowledge that will assist a fact-finder and if the witness is qualified as an expert by knowledge, skill, experience, training, or education, then that expert may testify with an opinion. Tex.R. Evid. 702; Jensen v. State, 66 S.W.3d 528, 542 (Tex.App.–Houston [14th Dist.] 2002, pet. ref'd). Expert testimony is admissible if (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation. See Hartman v. State, 946 S.W.2d 60, 62 (Tex.Crim.App. 1997). To be reliable, evidence based on a scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied

---

4. Appellant filed a motion to suppress the results of any blood tests on samples taken from him as well as any testimony concerning toxicology tests performed on such blood samples. The trial court granted appellant's motion to suppress results of the second blood test, the sample for which was drawn from appellant in a police officer's presence pursuant to the Texas Transportation Code. On appeal, appellant challenges only the results and expert testimony involving the first blood sample.

on the occasion in question. *Kelly v. State,* 824 S.W.2d 568, 573 (Tex.Crim.App.1992); *see Russeau v. State,* 171 S.W.3d 871, 881 (Tex.Crim.App.2005); *Hartman,* 946 S.W.2d at 63.

We review the trial court's determination of whether these requirements are met under an abuse-of-discretion standard. *Russeau,* 171 S.W.3d at 881; *Morales v. State,* 32 S.W.3d 862, 865 (Tex.Crim.App. 2000). Under this standard, a reviewing court will not disturb a trial court's decision if the ruling was within the zone of reasonable disagreement. *Bigon v. State,* 252 S.W.3d 360, 367 (Tex.Crim.App.2008); *Hinojosa v. State,* 4 S.W.3d 240, 250–51 (Tex.Crim.App.1999).

### 1. Evidence as to Appellant's Blood-Test Results

■ According to evidence in our appellate record, the Dimension RXL tests blood-alcohol content by separating blood serum from the whole blood in a centrifuge, mixing an enzyme with the blood serum, and then analyzing it for the alcohol content. Appellant argues that the results of blood tests performed on this machine are unreliable and that gas-chro-matography analysis is more reliable and accepted in the scientific community. Appellant, however, offers no authority for this argument beyond this assertion. Appellant also complains that the experts failed to explain how the enzymes used in the machine interacted with the alcohol in the blood sample to calculate blood-alcohol content.

### Reliability of the Dade Dimension RXL Analyzer

Whether blood-alcohol results from the Dimension RXL are reliable appears to be a matter of first impression in Texas courts. Though no Texas courts appear to have made express reference to the Dimension RXL, some Texas courts have analyzed whether a blood-alcohol test using blood serum, as in this case, rather than whole blood, and enzymes or a centrifuge is reliable.[5] Additionally, federal district courts have allowed blood-alcohol results from a Dade Dimension Analyzer, finding such results to be reliable.[6]

Majid Mashal, a medical toxicologist, testified at the Rule 705 hearing that he

---

**5.** *See Bigon,* 252 S.W.3d at 366–68 (analyzing blood-alcohol concentration using the hospital's blood-serum analysis and converting the results into whole-blood analysis terminology); *Morris v. State,* 214 S.W.3d 159, 175–77 (Tex.App.–Beaumont 2007, pet. granted) (assessing the reliability of blood-test results from Kodak Etchakem 750 in hospital's blood-serum test); *Garcia v. State,* No. 08–03–00351–CR, 2005 WL 1488384, at *4–5 (Tex. App.–El Paso June 23, 2005, no pet.) (not designated for publication) (assessing reliability of blood-test results from LX–20 chemical analyzer in hospital's blood-serum test); *Jessup v. State,* No. 13–02–00024–CR, 2004 WL 2612958, at *3 (Tex.App.–Corpus Christi Nov. 10, 2004, no pet.) (mem. op., not designated for publication) (holding blood-alcohol test results from analysis of blood serum on Abbot Axsym Analyzer are reliable); *Dean v. State,* No. 04–97–00077–CR, 1998 WL 652322, at *3 (Tex.App.–San Antonio Sept. 23, 1998, pet. ref'd) (not designated for publication) (holding reliable blood-alcohol test results from a "Du Pont aca analyzer," which analyzes reactions between enzymes and blood serum); *Reidweg v. State,* 981 S.W.2d 399, 403–04 (Tex. App.–San Antonio 1998, pet. denied) (holding blood-alcohol tests using blood-serum are valid because taking such tests is common practice, the results are more accurate, and the test results are standardized through the testing instrument).

**6.** *See United States v. Kent,* No. 4:06–CR–42, 2007 WL 1752305, at *1–2 (M.D.Ga.2007) (not designated for publication) (admitting blood-test results from Dade Dimension Analyzer); *United States v. Mason,* 143 F.Supp.2d 1241, 1242–45 (D.Colo.2001) (admitting blood-test results from Dade Dimension Analyzer).

analyzed appellant's blood specimen for blood-alcohol content using the hospital's Dimension RXL. Mashal holds a bachelor's degree in medical technology and the necessary training to run blood and urine samples. He also holds a master's degree in healthcare administration. Mashal received one week of training on this machine from Dade's scientists and experts, who designed and manufactured the Dimension RXL. Mashal testified that he has conducted thousands of blood tests on this machine and believes the testing procedures of the Dimension RXL are reliable. Mashal testified that the machine is a widely accepted instrument in his scientific community, and it is approved by the Food and Drug Administration ("FDA"). Mashal described how he received appellant's blood sample in a sealed package. Mashal knows procedures that safeguard a blood sample from contamination, and noted that appellant's blood sample showed no indication of contamination. Mashal explained that the Dimension RXL was working properly that day because he tested the machine for quality control before starting his work. The quality-control specimen showed the machine was running correctly because the machine would not accept a blood specimen if a quality-control specimen previously had failed, as shown by the machine's programmed message, until the problem was corrected. Mashal described how the machine uses a centrifuge to separate blood serum from the blood sample and how a probe picks up the blood serum or plasma and tests the specimen. The blood serum is analyzed after mixing with an agent to produce results for alcohol. Mashal admitted that he did not know the technicalities of exactly how the machine internally detects alcohol. Mashal, in applying proper techniques as learned from his training and experience, ran appellant's blood sample through the machine and received 0.280 as appellant's blood-alcohol

results. According to Mashal, the procedures used with this machine are generally accepted in his scientific community and are proven to be valid. Mashal also described how he similarly tested appellant's urine on the same machine and received positive results for marijuana and cocaine.

Roger Petty, a laboratory supervisor for the hospital that tested appellant's blood-alcohol content, testified at the Rule 705 hearing that he has not personally used the Dimension RXL. According to Petty, the Dimension RXL and its underlying methodologies are FDA-approved. The machine at this hospital is certified and remains up-to-date in its certification. Petty explained that he is not familiar with the technical aspects of the machine's analysis, for example, how the machine detects alcohol. However, on cross-examination, Petty described how test packs mix with the plasma of a specimen to produce a chemical reaction. The machine quantitatively measures the reaction, though Petty could not say what part of the machine actually measures this reaction. Petty explained that the results from this machine are used for medical purposes, and Petty was not familiar with any limitations on the use of the machine's results for forensic purposes, as appellant's trial counsel suggested. Petty confirmed that no blood samples can be run on the machine when a quality-control test fails, and quality control was up to date on this machine at all relevant times. Petty described how the machine runs quality-control tests daily and for each shift, and such tests must produce results within a certain range mandated by Dade in order to pass. Although Petty indicated that a rate of error exists on the machine, he was not familiar with the exact rate of error. Petty indicated that as long as the quality-control tests are successful, for medical purposes, there is no need to know the rate of error for the

machine. Petty also indicated that results from this test may not be as accurate as results from gas chromatography.[7] After Petty's testimony, the trial court explained that the State had not offered sufficient testimony from experts surrounding the science of the Dimension RXL, but the trial court did not specifically grant or deny appellant's motion.

The State offered testimony from Jima Ojha, who serves as the general director of pathology for the hospital that analyzed appellant's blood sample on the Dimension RXL. Ojha explained that a tube containing a blood sample is placed in the machine's analyzer, and a centrifuge spins the blood and separates the blood serum. The serum goes into an analyzer and mixes with a reagent, causing an enzymatic reaction. The absorbents of the final product are read by the machine using two filters. The machine uses an automatic filter that reads absorbent-matter levels by using the machine's photometer. The photometer is like a lens that reads absorbent matter at two different levels to verify the accuracy of the enzymatic reaction. If a patient has any toxins, the presence of such absorbent matter will be read by the machine's photometer. The machine then registers an automatic reading, and the machine will give a final result that has a reference range to be verified against the hospital's lab information system.

The principles implemented in this machine are photomatic absorbents, as opposed to gas chromatography, and such theories are generally accepted in the scientific community. Ojha explained that many hospitals use this methodology. According to Ojha, this machine was installed by Dade and has been regulated by the hospital pathologist and Dade. The trial court, for purposes of the hearing, admitted, with no objection from appellant, the hospital's standard operating-procedure manual for detecting alcohol, which, according to Ojha, described in detail the science behind the machine. Ojha admitted that she relies on this manual for her day-to-day operations.

Ojha received extensive training from Dade in using the Dimension RXL. Ojha also learned of the theories supporting the Dimension RXL while earning her degree in medical technology. Ojha explained that in conducting daily, quarterly, and per-shift system checks of the machine, the analyzer picks up a quality-control sample and the photomatic instrument pipette verifies that all parts of the analysis are in proper working order. Ojha specifically explained that the machine's operator does not determine which tests to conduct on the sample; rather, the machine reads a bar code on the blood sample's tube that contains patient data, and this bar code dictates which toxicology tests will be conducted on that blood sample. When the machine registers the results of a test, the operator simply verifies the results but has no subjective input in the specimen's analysis. On cross-examination, Ojha testified that because the machine registers only positive numbers, and not negative numbers, the machine is "absolutely accurate." If an error occurred or another substance interfered in analyzing a sample, the machine would register an error code and could not analyze the sample.

---

7. After Petty testified, the State presented expert testimony from a state forensic scientist, who analyzed the results of appellant's second blood-alcohol test. This witness testified that he is not familiar with the Dimension RXL, but that the instrument he typically uses implements gas chromatography, which is a methodology he characterizes as the "workhorse" of the forensics industry for testing alcohol. He declined to say whether he believed gas chromatography offered more accurate results.

■ The proponent of scientific evidence must prove its reliability by clear and convincing evidence. *Kelly,* 824 S.W.2d at 573. However, a "party seeking to introduce evidence of a scientific principle need not always present expert testimony, treatises, or other scientific material to satisfy the *Kelly* test." *Hernandez v. State,* 116 S.W.3d 26, 28–29 (Tex.Crim. App.2003). Factors to be considered in determining the reliability of scientific evidence include, but are not limited to the following:

(1) the extent to which the underlying scientific theory and technique are valid and accepted within the relevant scientific community;

(2) the qualifications of the experts testifying;

(3) availability of media accepting or rejecting the underlying scientific theory or technique;

(4) the potential rate of error in the technique;

(5) the availability of other experts to test and evaluate the technique;

(6) the clarity with which the scientific theory and technique can be explained in court; and

(7) the experience and skill of the person who applied the technique in question.

*See Kelly,* 824 S.W.2d at 573. The trial court heard evidence on most of these factors. Each of the State's experts detailed their training and qualifications in their field and specified that the science implemented by the Dimension RXL is accepted in their scientific and medical communities. Ojha described in detail how the methodology and scientific techniques of the Dimension RXL worked to detect alcohol. The operating manual on which Ojha relies daily, details the scientific principles involved, as reflected in the record. Though no witness identified a specific rate of error for the machine, each confirmed that the machine would not analyze any samples if an error code registered on the machine during a quality-control test. Finally, Mashal testified that in analyzing appellant's blood sample, he implemented the same techniques he learned in his week-long training by the Dade company in using the machine.

Though appellant complains that the experts did not explain how the enzymes interacted with the alcohol in the blood sample to calculate the blood-alcohol content, the trial court was satisfied with Ojha's testimony as to the underlying scientific theory involving photomatic readings of the absorbent matter created from an enzymatic reaction caused by mixing a reagent with blood serum. *See Dean v. State,* No. 04–97–00077–CR, 1998 WL 652322, at *2 (Tex.App.–San Antonio Sept. 23, 1998, pet. ref'd) (not designated for publication) (holding blood-alcohol results reliable despite expert's acknowledgment that she was "not real familiar" with the technique testing with enzymatic acids). Though reasonable minds may disagree, it was within the zone of reasonable disagreement for the trial court to conclude the State met the three *Kelly* factors by clear and convincing evidence regarding the Dade Dimension RXL. *See Kelly,* 824 S.W.2d at 573; *Jessup,* 2004 WL 2612958, at *4; *Dean,* 1998 WL 652322, at *3. Accordingly, the trial court did not abuse its discretion in allowing appellant's Dimension RXL blood-alcohol results or the expert-witness testimony regarding appellant's blood-test results to be presented to the jury. *See Jessup,* 2004 WL 2612958, at *4.

**2. Drug–Recognition Expert's Testimony**

■ Appellant next complains about the admission of testimony from a drug-

recognition expert, Houston Police Department Officer Francis LaSalle. Appellant complains that by allowing Officer LaSalle to testify about the general characteristics of marijuana use on an individual, the trial court "essentially allowed LaSalle to testify that appellant was under the influence of marijuana."

Officer LaSalle testified at the Rule 705 hearing that he is the head of the impaired driving program for the Houston Police Department. As a drug-recognition expert, he knows and recognizes the effects of alcohol and drugs in the human body. He completed several extensive training courses to learn the effects of chemicals on the body. He became certified as a drug recognition expert by taking a 152–hour course. Officer LaSalle is certified as an instructor to teach other drug-recognition experts, and he has taught dozens of courses to experts from four states. Officer LaSalle identified a number of physical and physiological factors for determining whether a person is under the influence of marijuana. Officer LaSalle testified that such methods in detecting drugs are scientifically validated and accepted in the scientific community. The scientific theories were certified by several major research universities, and results of the scientific studies have been published. Officer LaSalle testified that because the procedures for drug recognition are standardized across the nation, the results are highly accurate.

Based on his own training and experience and his review of appellant's medical records, Officer LaSalle testified at the Rule 705 hearing that the information within appellant's hospital records is consistent with signs of one under the influence of drugs or alcohol. Officer LaSalle indicated that appellant's normal body temperature and elevated pulse and blood pressure, as reflected in appellant's hospital records, are indicative of being under the influence of marijuana. Officer LaSalle coupled this information with the presence of marijuana in appellant's urine sample and offered an expert opinion that there is a strong indication of appellant's marijuana use.

The trial court ruled that Officer LaSalle could testify to general factors he looks for when determining whether a person is under the influence of marijuana and that marijuana was found in appellant's urine sample, as reflected in appellant's medical records. However, the trial court did not permit Officer LaSalle to testify that appellant was under the influence of marijuana. At trial, Officer LaSalle testified to the effects of alcohol and marijuana on a person's driving skills who had the same level of intoxication, 0.280, that appellant had on the night of the accident.

The record reflects that Officer LaSalle was qualified by his training and experience in drug recognition. *See* Tex.R. Evid. 702; *Bumgarner v. State*, No. 12–05–00243–CR, 2006 WL 1917961, at *5 (Tex. App.–Tyler July 12, 2006, pet. ref'd) (mem. op., not designated for publication). Moreover, the subject matter was appropriate testimony from a drug-recognition expert because his testimony fit the evidence of this case. *See Rousseau v. State*, 855 S.W.2d 666, 687 (Tex.Crim.App.1993). Officer LaSalle's testimony assisted the jury in understanding how the use of marijuana and a blood-alcohol level of 0.280 affect a person's driving skills. *See Bumgarner*, 2006 WL 1917961, at *5; *see also Hartman*, 946 S.W.2d at 62. Though reasonable minds may disagree, the trial court was within its discretion in determining that Officer LaSalle's testimony met the three criteria of *Kelly* in that he testified that (1) the underlying scientific theories for determining the effects of drugs and

alcohol on a person are valid; (2) the techniques in applying the theories are valid; and (3) Officer LaSalle applied those theories to a person exhibiting similar levels of intoxication and physiological symptoms as appellant. *See Kelly*, 824 S.W.2d at 573. Furthermore, Officer LaSalle did not testify that appellant, personally, was under the influence of marijuana. Therefore, the trial court did not err in admitting Officer LaSalle's testimony.

### 3. Accident–Reconstruction Expert's Testimony

 Finally, appellant claims the trial court erred in permitting testimony from accident reconstructionist Houston Police Department Officer James Tippy because he did not use the latest technology, a Vericom machine, in calculating appellant's speed. Appellant contends that a Vericom machine is the latest technology and is more reliable than a drag sled, as used by Officer Tippy, but appellant offers no authority for this conclusion beyond this assertion.

At the Rule 705 hearing, Officer Tippy testified that he has taken intermediate and advanced courses in accident, speed, and crash reconstruction. He has more than three hundred hours of field experience in accident reconstruction in his twenty-three years of service on the police force. He teaches police cadets basic accident-investigation skills. Officer Tippy explained how evidence from an accident offers numbers that can be plugged into a formula for calculating speed. Officer Tippy confirmed that studies have verified the accuracy and scientific validity of this methodology. Moreover, these methods are accepted in the scientific community.

Officer Tippy explained that, by testing the stickiness of the road and measuring the skid marks or yaw marks left by a vehicle, he can determine the drag factor and calculate a car's speed. To calculate speed or drag factor, or the surface coefficient, either a Vericom machine or a drag sled can be used. In this case, Officer Tippy used a drag sled, a certified scale, and a mathematical formula to measure how much weight the drag sled pulled in measuring the length of a yaw mark on the road. Officer Tippy has performed this procedure with yaw marks about fifty times. Regarding this accident, Officer Tippy measured the yaw mark and the radius of the yaw mark. Officer Tippy then entered these measurements, along with the figure taken from the drag sled, into a mathematical formula that calculated a velocity of 77.215. Officer Tippy explained that he properly applied the techniques and double-checked his measurements in calculating this speed and that such procedures are scientifically validated throughout the country. On cross-examination, Officer Tippy claimed that the Vericom machine is not as advantageous as the equipment he uses; and although the Vericom machines are the "latest and greatest technology," drag sleds have been used for at least fifteen years.

The State produced evidence that Officer Tippy's education and training in accident reconstruction qualifies him as an expert to testify to this subject matter. *See* Tex.R. Evid. 702; *DeLarue v. State*, 102 S.W.3d 388, 399 (Tex.App.–Houston [14th Dist.] 2003, pet. ref'd). Officer Tippy's testimony addressed the three criteria of the *Kelly* test in explaining how he calculated appellant's speed by using a drag sled. *See Kelly*, 824 S.W.2d at 573; *DeLarue*, 102 S.W.3d at 400. Officer Tippy attested to (1) the validity of the theory in using a drag sled underlying his accident-reconstruction methodology; (2) the validity of the techniques he used in applying the theory; and (3) that he specifically applied the techniques on the occasion in

question. We conclude that the trial court was within its discretion in allowing Officer Tippy to testify as to his calculations of appellant's speed based on his use of a drag sled. *See DeLarue*, 102 S.W.3d at 400; *see also Kelly*, 824 S.W.2d at 573. Therefore, we overrule appellant's second issue.

## C. Did the trial court err in denying appellant's requested lesser-included offense jury instruction for criminally negligent homicide?

■■■ In appellant's third issue, he argues the trial court erred in denying his requested jury instruction for the offense of criminally negligent homicide, which appellant asserts is a lesser-included offense of intoxication manslaughter. Appellant's requested charge stated that "driving too fast for the then existing conditions" constituted negligence. The trial court denied appellant's request.

An offense is a lesser[-]included offense if:

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX.CODE CRIM. PROC. ANN. art. 37.09 (Vernon 2006).

■■■ A defendant is entitled to every defensive issue raised by the evidence.

TEX.CODE.CRIM. PROC. ANN. art. 36.14 (Vernon 2007); *Gowans v. State*, 995 S.W.2d 787, 792 (Tex.App.–Houston [1st Dist.] 1999, pet. ref'd). To warrant a jury instruction on a lesser offense in the jury charge, a defendant must demonstrate that (1) the elements of the lesser offense are contained within the proof necessary to establish the charged offense as pleaded in the State's indictment, and (2) the record contains some evidence by which a jury rationally could conclude that if the defendant is guilty, the defendant is guilty of only the lesser offense and not the greater offense. *See Hall v. State*, 225 S.W.3d 524, 535 (Tex.Crim.App.2007) (applying "pleadings approach" as sole test for determining the first step in determining whether a party is entitled to a lesser-offense instruction); *Hayward v. State*, 158 S.W.3d 476, 478 (Tex.Crim.App.2005); *Rousseau*, 855 S.W.2d at 673; *Gowans*, 995 S.W.2d at 792.

The statutory elements of intoxication manslaughter, as modified by the particular allegations in the indictments, are as follows:

(1) appellant

(2) by accident or mistake

(3) operated a motor vehicle

(4) in a public place

(5) while intoxicated

 (a) by not having the normal use of his mental and physical faculties by reason of the introduction of alcohol or a combination of alcohol and cannabinoid in his body

 (b) and by having an alcohol concentration of at least 0.08 in his blood

(6) and as a result of the intoxication, caused the death of another person

(7) by driving his motor vehicle into and causing it to collide with the complainant.

*See* TEX. PENAL CODE ANN. § 49.08. We then compare these elements with the elements of the lesser-included offense of criminally negligent homicide that could be included in that offense:

(1) appellant

(2) caused the death of another

(3) by criminal negligence

 (a) with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and justifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*See* TEX. PENAL CODE ANN. § 19.05(a) (Vernon 2003) (defining criminally negligent homicide); *id.* § 6.03(d) (Vernon 2003) (defining criminal negligence). We then ask the question that Article 37.09(1) poses: Are the elements of the purported lesser-included offense "established by proof of the same or less than all the facts required to establish the commission of the offense charged"? *See Hall,* 225 S.W.3d at 536. The answer is that they are not. The facts required to prove the purported lesser-included offense include proof of a culpable mental state, facts that are not the same as or less than the facts required to establish the offense charged. *See id.*

 Because intoxication manslaughter requires no proof of culpable mental state, it is, by statute, a strict liability crime; whereas criminally negligent homicide requires a showing of a culpable mental state. *Reidweg,* 981 S.W.2d at 406–07; *see also Gowans,* 995 S.W.2d at 793. Proof of criminal negligence requires proof

of a greater mental state than intoxication manslaughter. *Reidweg,* 981 S.W.2d at 406–07. Because the elements for criminally negligent homicide are not the same as or less than the elements of intoxication manslaughter, as charged, criminally negligent homicide cannot be a lesser-included offense of intoxication manslaughter. *See Hall,* 225 S.W.3d at 536; *Gowans,* 995 S.W.2d at 793. In addition, criminally negligent homicide is not a lesser-included offense under the other three parts of article 37.09. *See* TEX.CODE CRIM. PROC. ANN. art. 37.09. Accordingly, appellant has not satisfied the first prong of the lesser-included offense test, making it unnecessary to reach the second prong of the test. *See id.; Torres v. State,* 52 S.W.3d 285, 287 (Tex.App.–Corpus Christi 2001, no pet.). A trial court is not obligated to instruct the jury on a lesser-included offense when the conduct establishing the lesser offense was not "included" within the facts required to prove the charged offense. *See Irving v. State,* 176 S.W.3d 842, 846 (Tex.Crim.App.2005); *Torres,* 52 S.W.3d at 287. Therefore, we overrule appellant's third issue.

**D. Did the trial court err in admitting appellant's statements to medical personnel?**

In his fourth issue, appellant complains that the trial court erred in admitting evidence regarding statements appellant made to a paramedic and a nurse, each of whom treated appellant's injuries. Appellant claims that the nurse's and paramedic's testimony as to these statements are not within an exception to the hearsay rule because these statements were not made for the purposes of obtaining medical treatment or diagnosis. Finally, appellant complains that the trial court erred in admitting hospital records that contained statements appellant made to the para-

medic and nurse about being run off the road into a ditch because appellant claims the statements were not obtained for medical purposes and are not trustworthy.

We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Coffin v. State*, 885 S.W.2d 140, 149 (Tex.Crim.App.1994). Under this standard, if the trial court's ruling was within the zone of reasonable disagreement, we will not disturb the ruling. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1990) (op. on reh'g).

### 1. The Paramedic's Testimony

■■■ Appellant complains of the paramedic's testimony at trial that appellant admitted drinking alcohol and smoking marijuana and that appellant admitted driving home from a bar, because appellant claims that these statements do not fit within an exception to the hearsay rule for medical diagnosis or treatment. To preserve a complaint for appellate review, a party must make a timely request, objection, or motion with sufficient specificity to apprise the trial court of the complaint. TEX.R.APP. P. 33.1(a); *Saldano v. State*, 70

S.W.3d 873, 886–87 (Tex.Crim.App.2002). Appellant has not cited and we have not found any place in the appellate record showing that appellant objected on hearsay grounds to the paramedic's testimony regarding these statements.[8] Therefore, appellant has waived this complaint.

### 2. The Nurse's Testimony

■■■ In his appellate brief, appellant cites the nurse's pre-trial testimony at a suppression hearing involving a blood sample. Appellant, however, failed to object to this testimony at trial.[9] *See* TEX.R.APP. P. 33.1(a). To preserve a complaint for appellate review, a party must make a timely request, objection, or motion with sufficient specificity to apprise the trial court of the complaint. *Id.; Saldano*, 70 S.W.3d at 886–87. Appellant has not cited and we have not found any place in the appellate record showing that appellant preserved his complaint by objecting to this testimony from the nurse.

■■■ Even if appellant had preserved his complaint, he has failed to adequately brief it in this court. To present an issue for appellate review "[t]he brief must con-

---

8. Before trial, appellant filed a motion to suppress statements he made to the paramedic on the premise that the paramedic, who worked for Houston Fire Department, served in a law enforcement-custodial capacity and appellant's statements were the product of custodial interrogation without proper *Miranda* warnings. The trial court denied the motion, and, on appeal, appellant does not challenge the trial court's ruling on this motion. Moreover, the basis of appellant's motion to suppress, on grounds of improper custodial interrogation, does not comport with appellant's hearsay objection that he now raises on appeal. *See* TEX.R.APP. P. 33.1(a)(1)(A); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex.Crim.App.2002) (providing that objection at trial must comport with objection on appeal); *Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Crim.App.1990) (providing an objection grounded on one legal basis may not be

used to support a different legal theory on appeal); *see also Roach v. State*, No. 14-06-00756-CR, 2008 WL 1862479, at *2 (Tex. App.–Houston [14th Dist.] Apr. 29, 2008, no pet. h.) (mem. op., not designated for publication) (failing to preserve error because appellate contention did not comport with arguments made at motion-to-suppress hearing).

9. Appellant's motion to suppress his statements made to medical personnel involved only statements made to the paramedic; the motion did not involve any statements made by appellant to the nurse. The nurse testified at a suppression hearing regarding her participation in drawing a blood sample from appellant. However, appellant did not complain of this particular testimony from the nurse at either the suppression hearing or at trial.

tain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Tex.R.App. P. 38.1(h). Appellant has not presented any argument in support of this complaint. He has not addressed any of the governing legal principles or applied them to the facts regarding the nurse's testimony; instead, appellant has cited legal authority and argued that the trial court erred in admitting the paramedic's testimony. *See King v. State,* 17 S.W.3d 7, 23 (Tex.App.–Houston [14th Dist.] 2000, pet. ref'd). Accordingly, we hold that appellant has waived error as to this particular testimony from the nurse.

### 3. The Hospital Records

 Finally, appellant complains the trial court erred in admitting appellant's hospital records, contained in "State's Exhibit 1," which refers twice to statements made by appellant to both the paramedic and the nurse regarding how the accident happened. Appellant complains that his statements in the records were not obtained for medical purposes and are not trustworthy. The hospital records contain notes from both the paramedic and nurse that appellant told each of them that he was involved in a motor vehicle accident when he was run off the road into a ditch. The records of which appellant complains were the subject of a pre-trial suppression hearing, and appellant objected to the records during the following exchange:

[DEFENSE COUNSEL]: Your Honor, the only objection I would have is a couple of places on here where [appellant] makes statements. One is the statement he made to the ambulance driver in which there is a location he talks about. He was inquiring about [a] motor vehicle accident on Almeda. I

would object to that as hearsay and not made for the purpose of any kind of medical reason.

There is a second blurb here under survey. He says: "a little too much." When [the nurse] asked him about alcohol he said, "a little too much tonight." I would object to that entry as well. Other than that, I have no objections.[10]

[PROSECUTOR]: Judge, basically on here these are the purposes for medical diagnosis. The survey was asked so they could get an accurate account of what he had done that night so they knew how to treat him properly.

[TRIAL COURT]: Until the Court hears evidence relative to the taking of those statements, then I am going to sustain the objection as to those portions in State's Exhibit 1 at this time.

. . .

[DEFENSE COUNSEL]: Otherwise, I have no objection.

[TRIAL COURT]: State's [Exhibit] 1 is admitted without objection with the exception of those portions that were drawn to the Court's attention by defense counsel. The objection as to those portions are [sic] sustained.

At the end of the hearing, the State moved to enter the records into evidence in their entirety in the following exchange:

[PROSECUTOR]: Judge, there's one more matter I'd like to take up with regard to State's Exhibit 1. You admitted it into evidence for both purposes of trial and as [sic] hearing and then you temporarily said you would not admit two pages, one with the statement that was made by—to the [paramedic] and the other the one to [sic] in regards to the statement that he made from [sic] medical purposes to [the nurse]. And

---

10. Appellant does not complain on appeal that the nurse testified to appellant's state-

ment to her admitting that he had "a little too much" alcohol to drink that night.

she came in and they both testified these were for medical purposes only and they are in the medical records and at this time we'd like to offer [a] complete medical record, State's Exhibit 1 in its entirety.

[DEFENSE COUNSEL]: Judge, my only position on those particular statements were [sic] made toward any medical purposes, and we would ask that any mention in the medical records, any statement by [appellant] in the medical records about what he had to drink or what he might have smoked or how this might have occurred not be allowed into evidence.

[TRIAL COURT]: I do recall the [paramedic] and the nurse testifying to statements that the defendant allegedly made to them. I do not recall them being asked about those specific statements.

. . .

[TRIAL COURT]: If they are able to testify to those specific statements, then I will allow if [sic] those statements that you are now proffering if they testify those statements were made for medical treatment. So far I know they testified generically about things he said to them, but I don't recall them being asked about those specific things.

Appellant did not secure a ruling on that issue at the hearing. At trial, the paramedic and the nurse each testified without objection that appellant told each of them that on his way home from a bar, he had been in a wreck and had been run off the road. After each of them testified to this information, when the hospital records were actually offered during the trial, the following exchange occurred:

[DEFENSE COUNSEL]: There were a couple of things that I had checked into the other day and these records that you sort of took under consideration but have not decided about yet.

The first is on the page involving notes from the [paramedic] talking about where he had been that night. I object to this portion . . . this deals with statements he made about driving into a ditch. I object to that based on that it's not made for the purposes—they were taken for purposes of medical reasons, so we object to this as hearsay.

. . .

[PROSECUTOR]: And he testified to that.

[TRIAL COURT]: Hold up. It appears to me the statement if these are statements, this was written by [the paramedic]. He testified to this.

[PROSECUTOR]: Okay. We will get that taken care of.

[TRIAL COURT]: At this time, to redact those statements.

[DEFENSE COUNSEL]: The next portion that I object to is a blurb. It is on the page entitled secondary survey . . ., and there is a notation here about under alcohol, it says a little too much tonight. I would object to that as not taken for the purposes of medical reasons. Also under 403 I believe it is substantially more prejudicial than probative.

[TRIAL COURT]: Well, the objection on that portion is sustained.

[DEFENSE COUNSEL]: And one more thing.

[PROSECUTOR]: I will redact this.

[DEFENSE COUNSEL]: Okay. I think we have an agreement as to the other ones. Thank you, Judge.

[TRIAL COURT]: I sustain the objection to the first part.

All of appellant's objections to his statements made to the paramedic about how the accident occurred as reflected in the hospital records either were sustained or

resolved by agreed redactions. To preserve error for our appellate review, appellant must have made a timely, specific instruction and obtained an adverse ruling from the trial court, and the issue on appeal must comport with the objection made at trial. *See Turner v. State,* 805 S.W.2d 423, 431–32 (Tex.Crim.App.1991). Because appellant did not receive an adverse ruling, appellant has not preserved the issue for our review as to the statements appellant made to the paramedic as contained in the hospital records. *See* TEX. R.APP. P. 33.1; *Turner,* 805 S.W.2d at 431–32.

 As to any statements appellant made to the nurse about how the accident occurred as contained in the hospital records, appellant failed to object to these statements. *See* TEX.R.APP. P. 33.1. Furthermore, even if we were to presume the trial court erred in admitting the statements from the nurse's notes, no harm ensued because the nurse already had testified without objection to these statements. *See Willis v. State,* 785 S.W.2d 378, 383 (Tex.Crim.App.1989) (holding harmless erroneous admission of evidence when the same facts had already been introduced through other admissible evidence without objection). Therefore, we overrule appellant's fourth issue.

**E. Did the trial court err in denying appellant's motion to quash an enhancement paragraph of the indictment?**

 In his fifth issue, appellant argues the trial court erred in denying his motion to quash the enhancement paragraph of the indictment. For each of the three indictments, the State sought enhancement of appellant's sentence based on a 1991 felony conviction of the unauthorized use of a motor vehicle and a 1994 conviction for possession of a controlled substance.

Appellant filed a motion to quash the enhancement paragraph for the 1991 conviction on grounds that though it was a third-degree felony in 1991, at the time of this trial such a conviction was only a state jail felony. The trial court denied appellant's request. We review a trial court's ruling on a motion to quash under an abuse-of-discretion standard. *See Thomas v. State,* 621 S.W.2d 158, 163 (Tex.Crim.App.1981); *Manning v. State,* 112 S.W.3d 740, 742–43 (Tex.App.–Houston [14th Dist.] 2003, pet. ref'd).

Appellant was charged in the present case with three second-degree felonies under Texas Penal Code section 49.08. A felony offense, as in this case, may not be enhanced by a state jail felony offense. *Jordan v. State,* No. 05–99–01620–CR, 2001 WL 118993, at *3 (Tex.App.–Dallas Feb. 13, 2001, no pet.) (not designated for publication). At the time of appellant's 1991 conviction, unauthorized use of a vehicle was a third-degree felony. *See* Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3606, 3640 (reclassifying the offense from a felony to state jail felony); *see also Castaneda v. State,* 911 S.W.2d 773, 774 (Tex.App.– San Antonio 1995, no pet.). Appellant's 1991 conviction was not a state jail felony in 1991. *See Jordan,* 2001 WL 118993, at *3; *Castaneda,* 911 S.W.2d at 775.

Effective September 1, 1994, the State reclassified the offense of unauthorized use of a motor vehicle from a third-degree felony to a state-jail felony. Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3606, 3640; *see Castaneda,* 911 S.W.2d at 774. In creating state jail felonies, the legislature specifically noted:

(a) The change in law made by this article applies only to an offense committed on or after the effective date of this article. For purposes of this section, an

offense is committed before the effective date of this article if any element of the offense occurs before the effective date. (b) An offense committed before the effective date of this article is covered by the law in effect when the offense was committed, and the former law is continued in effect for that purpose.

Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.18, 1993 Tex. Gen. Laws 3586, 3705; *see Castaneda*, 911 S.W.2d at 775. Only offenses committed on or after the effective date of the amendment, September 1, 1994, are affected by the reclassification. *See* Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.18, 1993 Tex. Gen. Laws 3586, 3705; *Jordan*, 2001 WL 118993, at *3.

The parties do not dispute that the 1991 offense, for which appellant was convicted, was committed prior to the effective date of the relevant amendment to the Penal Code. *Jordan*, 2001 WL 118993, at *3. Appellant's 1991 conviction is governed by the law in existence at that time, and the law then classified the offense as a third-degree felony. *See* Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.18, 1993 Tex. Gen. Laws 3586, 3705; *Jordan*, 2001 WL 118993, at *3; *Castaneda*, 911 S.W.2d at 775. The amendment that reclassified an offense for unauthorized use of a motor vehicle from a third-degree felony to a state jail felony did not affect the status of appellant's 1991 felony conviction for the same offense. *See* Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.18(b), 1993 Tex. Gen. Laws 3586, 3705; *Jordan*, 2001 WL 118993, at *3; *Castaneda*, 911 S.W.2d at 775; *see also Ex parte Rice*, 629 S.W.2d 56, 58–59 (Tex.Crim.App.1982) (providing that once a final felony conviction stands, it

may be used for enhancement even if the felony is later downgraded to a misdemeanor); *Moreno v. State*, 541 S.W.2d 170, 174 (Tex.Crim.App.1976) (considering final convictions for felonies to be permissible for enhancement purposes even when the current penal code defines the offense as a misdemeanor). Appellant's 1991 conviction for a third-degree felony of unauthorized use of a motor vehicle was properly used as an enhancement offense. *See Jordan*, 2001 WL 118993, at *3. Accordingly, the trial court did not abuse its discretion in denying appellant's motion to quash. *See Manning*, 112 S.W.3d at 744. Therefore, we overrule appellant's fifth issue.

The trial court's judgment is affirmed.[11]

---

11. Because we affirm, we need not reach the merits of the State's cross-point in which the State argues the trial court erred in suppressing the results of appellant's second blood test, the specimen for which was drawn pursuant to a mandatory blood-draw requirement of the Texas Transportation Code section 724.012.