

NUMBER 13-08-645-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **WES GOODE,** | **Appellant,** |

**v.**

| | |
|---|---|
| **THE STATE OF TEXAS,** | **Appellee.** |

## On appeal from the 117th District Court
## of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Vela
Memorandum Opinion by Justice Vela**

Appellant, Wes Goode, was indicted for intoxication manslaughter, a second-degree felony (Count 1) and intoxication assault, a third-degree felony (Count 2). *See* TEX. PENAL CODE ANN. § 49.08(a), (b) (Vernon Supp. 2009), § 49.07(a), (c). With respect to Count 2, the trial court instructed the jury on the lesser-included offense of driving while intoxicated (DWI). *See id.*, § 49.04 (Vernon 2003). The jury found appellant guilty of intoxication

manslaughter and DWI and assessed punishment at twenty years' imprisonment, plus a $10,000 fine, and 180 days in jail, plus a probated $2000 fine, respectively. The sentences are to run concurrently. In one issue, appellant challenges the legal and factual sufficiency of the evidence to prove his intoxication was a sole or concurrent cause of the accident that caused Adam Ramos' death. We affirm.

## I. FACTUAL BACKGROUND

### A. State's Evidence

At approximately 2:15 a.m. on December 16, 2007, Adam Ramos crashed into the middle barrier of the JFK Causeway, rendering his car inoperable. Aaron Ortiz and Ryan Rippstein stopped to help him. After Ortiz and Ramos moved the car into the right-hand lane, Ortiz walked back to his SUV, and Ramos stood on the shoulder of the road about twenty to thirty feet north of his wrecked car. Rippstein stood about ten feet in front of his own vehicle with its headlights and emergency lights turned on. He warned oncoming motorists by waving at them and pointing to their left. About ten vehicles drove past him, and most of them approached in the right-hand lane and then moved to the left lane, passing the accident scene without hitting either Ramos or his wrecked car. As appellant's pickup truck approached in the right-hand lane, Rippstein waved at appellant with both arms. When the pickup truck passed Rippstein, he saw its brake lights come on. According to Ortiz, who stood to the north of Ramos, appellant made no attempt to either change lanes or slow down. Ortiz saw Ramos silhouetted in the pickup's headlights and "impacted by the wreckage." Ramos died at the scene, and Ortiz jumped off the causeway to avoid being hit. After the accident, appellant got out on the driver's side of his pickup and asked Rippstein, "'Did anybody see what happened, this is my fault, . . . .'"

2

On cross-examination, Ortiz testified that the portion of the causeway where the accident occurred was not well lit and that several lights were not working. However, he stated that "with the use of headlights it would have been fine."

Officer Lonnie Jackson testified that when he arrived at the scene, appellant "was impaired," smelled of alcohol, had bloodshot, glassy eyes, and "was a little unsteady on his feet." He stated that appellant told him that "he had tried to avoid hitting the car, so he swerved out of the lane and tried to avoid hitting the car, and he hit the car." Officer Jackson also testified that appellant "admitted he was [the] driver" and "said he had been at Farrah's, drinking some beer. . . ." When the prosecutor asked him if appellant "appear[ed] at that point to be possessing his normal, physical faculties" or his "normal, mental faculties," he answered, "No" to both questions. On cross-examination, when defense counsel asked him, "And when Wes [appellant] told you he swerved to miss hitting a car, he said he had hit the gentleman standing behind the car, didn't he?", he said, "Yes."

At 4:17 a.m. during the morning of the accident, a blood specimen was drawn from appellant. Laboratory analysis of the blood specimen showed a 0.22 blood alcohol concentration.

Officer Gary Williams investigated the accident and testified that appellant's pickup hit Ramos and Ramos's car. He did not see any skid marks from appellant's pickup truck. Skid marks would have shown that appellant had applied the brakes prior to the collision. He believed that appellant caused the fatal accident.

**B. Defense Evidence**

Martin Wright and Gloria Clements came upon the accident scene in separate vehicles prior to appellant's involvement. When Wright saw Ramos's wrecked car in the right-hand lane, he switched from the right-hand lane into the left-hand lane and went

around Ramos's car. He described the lighting at the scene as "[v]ery dim, not bright at all." Clements drove on the left-hand lane and saw that "most of [Ramos's car] was on the . . . right lane and partial was on the left." She slowed down to forty miles per hour, drove between the left lane and the shoulder, and went past the wrecked car. Neither Wright nor Clements saw anyone standing on the side of the road waiving their arms.

Appellant's friend, Stephanie Caraway, met with him at Farrah's where he began drinking beer. She testified that when they left Farrah's in separate vehicles, appellant did not appear intoxicated. She followed behind him as he drove on the causeway. After seeing his pickup truck swerve and its brake lights come on, she stopped behind him. She saw Ramos on the ground in front of appellant's pickup truck, but she testified that if appellant would have hit something, she would have hit his pickup truck. Appellant, who was crying and hysterical, told Caraway that he "didn't see anybody. It all happened so quick." She did not see anybody standing by the side of the road waving their arms.

Oren Moore, who retired from the Texas Department of Public Safety after thirty-one years as a highway patrol captain, testified as an expert concerning accident reconstruction. He reconstructed the fatal accident and estimated appellant's speed at forty-five miles per hour. He found no evidence of a collision between appellant's pickup truck and Ramos's car. He found no skid marks at the scene but said this was not unusual because the anti-lock braking system on vehicles is not designed to leave skid marks. On cross-examination, he testified that a person with a 0.22 blood-alcohol concentration would have an impaired reaction time.

## C. State's Rebuttal

Ryan Rippstein testified that he did not see any vehicle following appellant's pickup. He stated that Ramos's car was not in the middle of the road.

## II. DISCUSSION

By a single issue, appellant challenges the legal and factual sufficiency of the evidence to prove his intoxication was a sole or concurrent cause of the accident that caused Ramos' death. Specifically, he argues that the evidence is insufficient to prove causation, namely, that the accident was by reason of his intoxication.

### A. Legal Sufficiency

"When conducting a legal sufficiency review, a court must ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '*it* believes that the evidence at trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)) (emphasis in original). "In doing so, we assess all of the evidence 'in the light most favorable to the prosecution.'" *Id*. (quoting *Jackson*, 443 U.S. at 319). "After giving proper deference to the fact finder's role, we will uphold the verdict unless a rational fact finder must have had reasonable doubt as to any essential element." *Id*. at 518.

### 1. Applicable Law

Our review of a legal and factual sufficiency challenge should be examined under the principles of review for a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex. Crim. App. 2008). "'Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim.

App. 1997)).

The indictment in this case alleged, in relevant part, that appellant:

> did then and there operate a motor vehicle in a public place while intoxicated by not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, or a dangerous drug into the body, or by having an alcohol concentration of at least .08, and did, by reason of such intoxication, cause the death of another, namely Adam Ramos by accident or mistake, to wit: BY DRIVING SAID MOTOR VEHICLE AND STRIKING ADAM RAMOS, . . . .

(emphasis in original). The statutory elements of intoxication manslaughter, as charged in the indictment, are as follows: (1) appellant (2) operated a motor vehicle (3) in a public place (4) while intoxicated[1] by not having the normal use of his mental and physical faculties by reason of the introduction of alcohol into his body (5) and as a result of the intoxication, caused the death of an individual, namely, Adam Ramos (6) through accident or mistake, to-wit: by driving said motor vehicle and striking Adam Ramos. *See* TEX. PENAL CODE ANN. § 49.08; *see Auldridge v. State*, 228 S.W.3d 258, 260 (Tex. App.–Fort Worth 2007, pet. ref'd) (setting forth elements of intoxication manslaughter). The State must prove that a defendant's intoxication, and not just her or her operation of a vehicle, caused the fatal result. *Glauser v. State*, 66 S.W.3d 307, 313 (Tex. App.–Houston [1st Dist.] 2000, pet. ref'd).

In Texas, the law of criminal causation as it relates to the defendant's conduct is as follows: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly

---

[1]A person is considered to be "intoxicated" if that person: (1) does not have the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a narcotic, a dangerous drug, a combination of any of those substances, or any other substance into the body; or (2) has an alcohol concentration in his breath, blood, or urine of .08 or more. TEX. PENAL CODE ANN. §§ 49.01(2)(A), (B) (Vernon 2003).

insufficient." TEX. PENAL CODE ANN. § 6.04(a) (Vernon 2003). By its language, the statute has two prongs. *Quintanilla v. State*, 292 S.W.3d 230, 234 (Tex. App.–Austin 2009, pet. ref'd). First, the general rule of causation—"A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause." *Id*. Second, the exception to the rule when there is a concurrent cause—"unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." *Id*. The concurrent-cause exception presupposes that the result would not have occurred but for the actor's conduct. *Id*. If the actor's conduct was not a cause of the result under the general rule, it could not be a concurrent cause to which the exception might apply. *Id*.

In other words, "but for" causation, as referred to in section 6.04(a), "must be established between an accused's conduct and the resulting harm." *Wooten v. State*, 267 S.W.3d 289, 296 (Tex. App.–Houston [14th Dist.] 2008, pet. ref'd); *see Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986). "When concurrent causes are present, the 'but for' requirement is satisfied when either: (1) the accused's conduct is sufficient by itself to have caused the harm; or (2) the accused's conduct coupled with another cause is sufficient to have caused the harm." *Wooten*, 267 S.W.3d at 296. "If an additional cause, other than an accused's conduct is clearly sufficient by itself to produce the result, the accused's conduct by itself is clearly insufficient, then the accused cannot be convicted." *Id*. The State may rely on circumstantial evidence to establish a causal connection. *Id*.

## 2. Analysis

The evidence showed that appellant was driving his pickup truck on the JFK Causeway at forty-five miles per hour at night. By his own admission, he had been drinking

beer shortly before his involvement in the fatal accident. A blood test taken about two hours post accident revealed his blood alcohol content to be 0.22, about two and one-half times the amount that defines intoxication in the penal code. *See* TEX. PENAL CODE ANN. § 49.01(2), (B) (Vernon 2003). Even though appellant approached the accident scene in the right-hand lane, which was blocked by Ramos's car, Rippstein stood about ten feet in front of his own vehicle with its headlights and emergency lights turned on. He warned oncoming motorists by waving at them and pointing to their left. About ten vehicles drove past him, and most of them approached in the right-hand lane and then moved to the left lane. These motorists went past the accident scene without hitting either Ramos or his wrecked car. When appellant approached in the right-hand lane, he did not change lanes. He hit Ramos's car, which in turn hit Ramos, who stood on the shoulder of the causeway about twenty to thirty feet north of his wrecked car. After the accident, appellant smelled of alcohol, had bloodshot, glassy eyes, and "was a little unsteady on his feet." He was impaired and did not have his normal physical faculties or his normal mental faculties. Dr. Ray Fernandez, the medical examiner who performed Ramos's autopsy, classified the manner of death as an "accident," and when asked by the prosecutor if someone with a 0.22 blood-alcohol concentration "is something that could contribute to an accident," he said, "Yes, it can." He testified that a 0.22 blood-alcohol concentration would cause impairment in judgment, reaction time, motor skills, and perception. He stated that appellant's 0.22 blood alcohol concentration would have been "close to a .26" blood alcohol concentration two hours prior to the blood draw. He also testified that Ramos had numerous injuries and listed his cause of death as blunt-neck trauma in which the neck is separated from the skull. He stated that this injury is consistent with a pedestrian being hit by an automobile, such as a truck.

8

The record does not show that Ramos's conduct constituted an independent cause of death unrelated to appellant's conduct. Ortiz testified that after Ramos hit the middle barrier, he did not appear physically injured. This testimony is substantiated by that of Anselmo Garcia, a medical doctor, who went up to the causeway shortly after hearing Ramos's car hit the barrier. Dr. Garcia saw Ramos standing up and heard him speak. Ortiz testified that after he and Ramos moved Ramos's car into the right-hand lane, "[any] vehicle in the left lane would have been able to go by without impacting the wreckage." While Ortiz walked to his SUV, Ramos remained on the shoulder of the road near the railing barrier, where Ortiz had asked him to stay. Ortiz stated that a yellow line divided the right-hand traffic lane from the shoulder of the road, and he considered the right-hand "lane unpassable because the wreckage was still in it. . . ." He also testified that Ramos "was two to three feet from that yellow line, so that if the lane had been passable and a vehicle had driven by, [Ramos] would have been standing close enough that it would have passed by his nose."

Dr. Garcia returned to the causeway shortly after the fatal accident and saw Ramos laying on the pavement. He started CPR, but Ramos died at the scene. When the prosecutor asked Dr. Garcia if he believed that from the injuries that Ramos "was dying from were caused from the first accident or the second accident," he said, "[F]rom what I saw in minute one and I saw in minute one of the second accident, I would have said it was from the second accident. I couldn't tell you more specifically without any other tests." When the prosecutor asked Dr. Fernandez whether Ramos' injuries were sustained following the first accident, as opposed to the second accident, he said, "[s]ome of these injuries may be from the first crash, some of them from the second crash. The injury where the neck is separated from the . . . skull, the spinal injury, that is a fatal-type injury that

9

once it happens, the person is not up and around." He testified that Ramos had a blood alcohol level of 0.27, which was not a fatal level of alcohol.

Based on the evidence proffered by the State, a reasonable fact finder could have found beyond a reasonable doubt that appellant operated a motor vehicle on a public road while intoxicated, because he exhibited signs of intoxication and had a blood-alcohol concentration of 0.08 or more, and he did not have the normal use of his physical and mental faculties at the time. *See* TEX. PENAL CODE ANN. §§ 49.08(a), 49.01(2)(B). Additionally, we hold that a fact finder reasonably could have found beyond a reasonable doubt that Ramos' blunt-neck trauma would not have occurred but for appellant's intoxication. *See* TEX. PENAL CODE ANN. § 6.04(a). Viewing the evidence in the light most favorable to the verdict, Ramos's conduct constituted at most a concurrent cause of his death, not an alternative cause that resulted in his death independent of appellant's conduct. *See Barnette v. State*, 709 S.W.2d 650, 651 (Tex. Crim. App. 1986) (distinguishing between concurrent causation and alternative causation). Viewed in the light most favorable to the verdict, the evidence supports a finding beyond a reasonable doubt that appellant's conduct was sufficient in itself to cause Ramos's death and that appellant's conduct was not "clearly insufficient" to cause Ramos' death within the meaning of the concurrent-cause exception. *See* TEX. PENAL CODE ANN. § 6.04(a); *Quintanilla*, 292 S.W.3d at 234.

## B. Factual Sufficiency

In a factual-sufficiency review, the only question to be answered is: "Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt?" *Grotti*, 273 S.W.3d at 283. Evidence can be deemed factually insufficient in two ways: (1) "the evidence supporting the conviction is 'too weak' to support

the fact finder's verdict"; or (2) "considering conflicting evidence, the fact finder's verdict is 'against the great weight and preponderance of the evidence.'" *Laster*, 275 S.W.3d at 518 (quoting *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). When a court of appeals conducts a factual-sufficiency review, it must defer to the jury's findings. *Id*. The court of criminal appeals has "set out three 'basic ground rules' implementing this standard." *Id*. (quoting *Watson*, 204 S.W.3d at 414). First, the appellate court must consider all of the evidence in a neutral light, as opposed to in a light most favorable to the verdict. *Id*. Second, the appellate court "may only find the evidence factually insufficient when necessary to 'prevent manifest injustice.'" *Id*. (quoting *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997)). Third, the appellate court must explain why the evidence is too weak to support the verdict or why the conflicting evidence greatly weighs against the verdict. *Id*. Although the verdict is afforded less deference during a factual-sufficiency review, an appellate court is not free to "override the verdict simply because it disagrees with it." *Id*.

The contrary evidence showed that: (1) appellant did not appear intoxicated when he left the nightclub; (2) prior to the accident, appellant was neither speeding nor driving erratically; (3) prior to the accident, Caraway saw his pickup truck swerve, and she and Rippstein saw his brake lights come on; (4) appellant immediately stopped after the collision; (5) appellant told Officer Jackson that Ramos was standing behind his wrecked car; (6) Caraway testified that appellant told her that he did not see Ramos; (7) the portion of the causeway where the accident occurred was not well lit; (8) no one saw Rippstein standing on the side of the road, warning oncoming traffic; (9) appellant's accident reconstruction expert found no evidence of a collision between appellant's pickup truck and Ramos's car and testified that the lack of skid marks at the scene was not unusual

11

because a vehicle's anti-lock braking system is not designed to leave skid marks; (10) appellant cried after the accident; and (11) after Ramos hit the middle barrier, Ortiz noticed he had slurred speech, smelled of alcohol, and did not respond to instructions.

The contrary evidence does not greatly outweigh the proof that appellant's intoxication caused Ramos' death. The jury was free to believe or disbelieve any portion of the witness's testimony, and we presume the jury resolved conflicts in favor of the prevailing party. *Wooten*, 267 S.W.3d at 296. Even if other factors contributed in some way to the fatal accident, these factors were not clearly sufficient to cause the fatality in this case.

Viewing all the evidence in a neutral light, we conclude that the evidence supporting the conviction is not so weak that the fact finder's determination is clearly wrong and manifestly unjust, or that the verdict is against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 417.

We hold that the evidence is both legally and factually sufficient to prove that appellant's intoxication was a sole or concurrent cause of the accident that caused Ramos' death. Appellant's sole issue is overruled.

### III. Conclusion

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 25th
day of March, 2010.