

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-15-00164-CR**
**NO. 02-15-00165-CR**
**NO. 02-15-00166-CR**
**NO. 02-15-00167-CR**


BENJAMON RAY STEWART A/K/A                               APPELLANT
BENJAMON TODD STEWART


V.


THE STATE OF TEXAS                                          STATE


----------

FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NOS. 1336013D, 1336014D, 1336015D, 1336016D

----------

## MEMORANDUM OPINION[1]

----------

Appellant Benjamon Ray Stewart a/k/a Benjamon Todd Stewart appeals from his conviction for failure to stop and render aid and from his three convictions for intoxication manslaughter with a vehicle. Because we conclude

---

[1]*See* Tex. R. App. P. 47.4.

that the evidence was sufficient to support his convictions and that he procedurally defaulted his claim that his sentences were disproportionate to the offenses, we affirm the trial court's judgments.

## I.  BACKGROUND

### A.  FACTUAL HISTORY

On July 23, 2013 from 6:30 p.m. until approximately 10:30 p.m., Stewart played pool and drank three or four beers at a bar in Fort Worth.  After leaving the bar, Stewart made purchases at a nearby Walmart store, once at 11:31 p.m. and again at 12:46 a.m.  A Walmart employee, who helped Stewart load his items into his truck after his second shopping trip, noticed that Stewart had a "kind of strong" smell of alcohol on his breath.  After his items were loaded, Stewart asked the Walmart employee where he could "get some more alcohol."

Meanwhile, Najib Intidam, his wife Hanane Bakchine, and their eleven-month-old daughter Nour Elhouda Intidam were also shopping at the same Walmart store during the early morning hours of July 24, 2013.  When they left Walmart at 2:13 a.m. in their Toyota Camry, Najib was the driver, Hanane was in the front passenger seat, and Nour was in a car seat behind Najib in the backseat.  Video footage showed that their car had working headlights, tail lights, and brake lights.

A little after 2:00 a.m., Roy Hammonds Sr. stopped behind Stewart's truck at a red traffic light located at an intersection to a highway feeder road near the Walmart.  When the light turned green, Stewart did not move.  Hammonds waited

2

a few seconds and then honked his horn, which caused Stewart to pull through the intersection. As Stewart went to make a left onto the feeder road, he swung wide on his turn, running over a curb and almost hitting a light pole. Hammonds then made the same left turn onto the feeder road but lost sight of Stewart's truck after Stewart sped off once he got on the highway.

Ten to fifteen seconds later, Hammonds saw Stewart's truck parked on a grassy embankment next to the far right lane of the highway. In the middle lane of the highway, Hammonds saw what he thought was a large load of trash that had dropped off a garbage truck; however, he soon realized that it was a "demolished" Toyota Camry with no functioning lights. Hammonds described the Camry as "like a sheet of tinfoil you wadded it up and threw it down." He pulled over in front of Stewart's truck and saw that Stewart was standing next to his truck, inspecting it for damage. Hammonds called 911 and left, not realizing that three people remained in the Camry.

At approximately 2:20 a.m. that morning, Bruce Sloan was traveling on the highway in his truck, towing a twenty-foot trailer. Sloan was driving in the middle lane when he saw what he thought was a dumpster in the road immediately in front of his truck. Unable to stop, Sloan crashed into the object in the middle lane. Sloan's truck stalled, and the Camry was pushed forward toward the inside lane of the highway, rotating so that it faced oncoming traffic. Sloan got out of his truck and called 911.

3

James Lopez Sr. was driving in the center lane of the highway and saw a car's headlights pointing towards him and other cars on the highway "start to swerve." He immediately pulled over to the far left side of the highway and "ran back to the car to check on the people." Lopez went to the driver's side and found Najib slumped underneath the steering wheel, breathing but unresponsive. Hanane was in the passenger seat sprawled across the console "like a plank, real stiff" and also unresponsive. Lopez saw Nour trapped underneath Hanane in the front passenger seat and believed that Nour was "already dead." Najib was declared dead at the scene; Hanane and Nour died a short time later.

A person at the scene of the crash told a police officer that he had seen Stewart run from his truck up a hill next to the highway into a "thick treeline." The officer asked the fire department to use a thermal camera to help locate Stewart. A firefighter and two police officers used the thermal camera and found Stewart lying on his stomach buried underneath the brush in the treeline. As an officer handcuffed Stewart, he noticed a very strong smell of alcohol coming from Stewart and that Stewart could not balance as he walked down the hill.

The officers put Stewart in the back of a police car and requested that a DWI officer be dispatched to the scene to perform field-sobriety tests. The DWI officer arrived at the accident scene at 3:19 a.m., one hour after the crash. He approached Stewart and "immediately became overwhelmed" by the odor of alcohol on Stewart's breath. The DWI officer also saw that Stewart's eyes were glassy and bloodshot and that his speech was slurred. Stewart failed the

4

horizontal-gaze-nystagmus test, the walk-and-turn test, and the one-leg-stand test. The DWI officer obtained a search warrant for a sample of Stewart's blood, which revealed that Stewart had an alcohol concentration of 0.289 four hours after the crash occurred. Because of the natural dissipation of alcohol, Stewart's alcohol concentration at the time of the accident four hours earlier likely was higher than 0.289.

## B. PROCEDURAL HISTORY

### 1. Trial

A grand jury indicted Stewart with intoxication manslaughter with a vehicle for the deaths of Najib, Hanane, and Nour and included a deadly-weapon notice in each indictment, alleging that Stewart used his truck in a manner that was capable of causing death or serious bodily injury. *See* Tex. Penal Code Ann. § 49.08 (West 2011). The grand jury additionally indicted Stewart with three counts of failure to stop and render aid to Najib, Hanane, and Nour and included a deadly-weapon notice for Stewart's truck. Tex. Transp. Code Ann. § 550.021 (West Supp. 2015). Stewart pleaded not guilty to each charge.

At trial, the State called Dr. Nizam Peerwani, a forensic pathologist and Tarrant County's medical examiner. Peerwani concluded that Najib's death was caused by a severe and nonsurvivable closed-head injury sustained in the collisions. Peerwani testified that Hanane's death was caused by an impact injury to her chest along with a tracheal tear, both of which were directly caused by the collisions. Hanane's five broken ribs and torn trachea caused air to leak

5

into her chest area and resulted in respiratory failure. These injuries caused Hanane to be in extreme pain with conscious suffering before she died. Peerwani concluded that Nour's death was caused by a head injury as a result of the car collisions. Nour's skull was collapsed and her brain was "pulverized" and "totally destroy[ed]." Based on the fact that the family had been rear ended at a high speed by an intoxicated driver, Peerwani concluded that all three deaths had been homicides. He could not determine with medical certainty whether the first impact or the second was the cause of the deaths; however, he could conclude that the deaths were homicides because the second collision would not have occurred absent the first collision.

The State also called as a witness Tim Lovett, a collision investigator. After analyzing the crash site, Lovett determined that the first crash occurred in the right lane and that Stewart hit the back of the Camry "square on," completely disabling the Camry. Lovett testified that at the moment of impact, Stewart's speed was between seventy-three to seventy-eight miles per hour and the family was traveling between fifty and sixty miles per hour.[2] The difference in speed at the time of impact—the closing velocity—was close to twenty-eight miles per hour. The force of the impact with Stewart's truck caused the Camry to travel forward 387 feet. Stewart's truck continued on for 712 feet after the collision and

---

[2]The speed limit on this section of the highway is sixty miles per hour.

"shortly" braked only after the crash. No physical evidence suggested that Stewart attempted to stop before he hit the Camry.

Lovett testified that at the time of the second collision, Sloan was driving fifty-nine miles per hour. The second crash transferred significantly more energy than the first crash, causing more damage. Lovett opined that the impact between Stewart's truck and the Camry was not severe enough to directly cause anyone's death. However, he also testified that Stewart would have been able to avoid the collision if he had not been intoxicated and that it was Stewart's actions that placed the Camry in a position to be hit by Sloan. Lovett therefore concluded that Stewart's intoxication caused the first collision and was the cause of Najib's, Hanane's, and Nour's deaths.

A jury found Stewart guilty of each offense and found the deadly-weapon allegations regarding the intoxication-manslaughter convictions to be true.[3] After a punishment hearing at which the State introduced a presentence investigation report, the trial court assessed Stewart's punishment at twelve years' confinement for the intoxication manslaughter of Najib, at twelve years' confinement for the intoxication manslaughter of Hanane, and at five years' confinement for failure to stop and render aid. The trial court ordered these sentences to run concurrently with each other. The trial court also assessed Stewart's punishment at ten years' confinement for the intoxication manslaughter

_____

[3]The State waived the deadly-weapon notice included in the failure-to-stop-and-render-aid indictment before trial.

7

of Nour, which the trial court ordered to run consecutively with the twelve-year sentences for the deaths of her parents. *See* Tex. Penal Code Ann. § 3.03(b)(1)(A) (West Supp. 2015).

## 2. Appeal

Stewart's court-appointed appellate attorney filed a motion for new trial six days after the judgments were entered, and Stewart filed a pro se motion for new trial twenty-nine days after the judgments. Both were deemed denied because the trial court failed to expressly rule on either motion within seventy-five days after imposing sentence in open court. *See* Tex. R. App. P. 21.8(a), (c). However, the trial court concluded that Stewart's pro se motion for new trial clearly indicated that he desired to appeal his convictions and forwarded Stewart's pro se new-trial motion to this court on May 18, 2015. *See generally Harkcom v. State*, 484 S.W.3d 432, 434 (Tex. Crim. App. 2016) ("All that is required [to perfect an appeal] is that the notice be in writing, be submitted within thirty days or ninety days after sentencing, as appropriate, and show the party's desire to appeal from the judgment or other appealable order.").

Now on appeal, Stewart's court-appointed counsel argues that the evidence was insufficient to support his convictions and that his sentences were unconstitutionally disproportionate to the offenses. During the pendency of Stewart's appeal, Stewart has attempted to file many pro se letters and motions. In several of these filings, Stewart has expressed dissatisfaction with the representation counsel has provided and requested that he be "bench

8

warrant[ed]" to Tarrant County to speak with counsel. He has also requested that he be allowed to file an out-of-time motion for new trial to "prove the representation of counsel I have suffered." Although we returned many of Stewart's filings to him because his efforts were impermissible attempts at hybrid representation, we have reviewed Stewart's pro se complaints and find no basis to conclude that his contentions directed to appointed counsel's appellate representation entitle him to any relief on direct appeal.[4] *See, e.g., Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) ("A substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on direct appeal.") We now turn to the arguments raised in the brief filed by Stewart's appellate counsel.

## II. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD AND SCOPE OF REVIEW

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We must consider all the evidence admitted at trial, even if improperly admitted, when performing a sufficiency

---

[4]We note that appellate counsel incorporated many of the arguments Stewart asserted in his pro se motion for new trial into his brief on appeal.

9

review. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014); *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the fact-finder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49.

## B. INTOXICATION MANSLAUGHTER

In his first point, Stewart contends that the evidence is legally insufficient to prove either that he caused the deaths of Najib, Hanane, and Nour or that he was intoxicated at the time of the accident.

### 1. Intoxication

We conclude that the evidence sufficiently showed that Stewart was intoxicated when he ran into Najib, Hanane, and Nour's Camry at approximately 2:00 a.m. Stewart recognizes that he stipulated that his alcohol concentration

10

was 0.268 four hours after the accident but asserts there was no evidence that he was intoxicated four hours earlier at the time of the crash. A toxicologist testified at trial that Stewart's alcohol concentration was "most likely higher" than 0.268 at the time of the accident:

A. [Stewart's alcohol concentration at the time of the accident] was most likely higher than the result that was obtained at the time of the blood draw.

Q. And why is that?

A. Well, we have four hours where we know the individual wasn't drinking. So the body is eliminating alcohol for . . . that entire time. So for an average male that's about .06 grams per 100 millimeters worth of alcohol that the body has removed. If we knew . . . the time of last drink and it was sufficiently prior to the accident, we would add .06 to the total and you would have a result at the time of driving.

I say it's most likely higher because there's always a chance - - since we don't know the time of last drink that the individual consumed a large amount of alcohol right before the wreck, in the form of liquor, and after the wreck that alcohol was absorbed into the system.

He also testified that it was "not likely" that Stewart's alcohol concentration was below the legal limit of 0.08 at the time of the crash because his alcohol concentration was more than three times the legal limit four hours later. *See* Tex. Penal Code Ann. § 49.01(2)(B) (West 2011). Further, Stewart smelled strongly of alcohol when he was arrested, and the DWI officer testified that Stewart's speech was slurred and he could not pass the field-sobriety tests an hour after the accident occurred. The jury heard that, prior to the accident, Stewart failed to proceed through an intersection when his light turned green because, in Hammonds's opinion, Stewart appeared to be asleep at the wheel.

11

After Hammonds honked his horn, Stewart turned wide right, running up on a curb in the direction of a light pole. Finally, Lovett opined that Stewart could have avoided crashing into the Camry and stated that Stewart travelled on for 712 feet after the crash before attempting to stop. This evidence was sufficient to allow a reasonable fact-finder to determine that Stewart was intoxicated at the time of the crash. *See Kuciemba v. State*, 310 S.W.3d 460, 462–63 (Tex. Crim. App. 2010); *Perez v. State*, No. 14-14-00887-CR, 2016 WL 2605755, at *5–6 (Tex. App.—Houston [14th Dist.] May 5, 2016, no pet. h.).

### 2. Causation

In arguing the lack of causation evidence, Stewart relies on Lovett's testimony that Stewart's crash did not cause the family's death. Causation is an essential element of intoxication manslaughter. *See* Tex. Penal Code Ann. § 49.08(a)(2). Causation is statutorily defined in terms of a but-for analysis: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." *Id.* § 6.04(a) (West 2011). In other words, there must be a but-for link between the defendant's conduct and the resulting harm. *See Wooten v. State*, 267 S.W.3d 289, 296 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). When a concurrent cause is present, the but-for requirement is met if either (1) the defendant's conduct is sufficient by itself to have caused the

12

harm or (2) the defendant's conduct coupled with another cause is sufficient to have caused the harm. *See id.*

We conclude that the evidence supported a conclusion that Stewart's conduct, coupled with the unavoidable collision with Sloan, was sufficient to have caused Najib's, Hanane's, and Nour's deaths. Although Lovett testified that he believed the accident with Stewart did not directly cause the deaths, he stated that Stewart's actions—driving while intoxicated at a high speed—placed the family's car in a position to subsequently be unseen and hit by Sloan. Peerwani testified that the family would not have been killed but for the first collision with Stewart.

Stewart seems to argue that without evidence that the first collision alone was sufficient to cause the family's deaths, he cannot be found guilty of intoxication manslaughter. The definition of causation is not so limited. *See id.* at 295–96. With concurrent causes, a defendant is criminally responsible unless his conduct was "clearly insufficient" to have caused the deaths. Tex. Penal Code Ann. § 6.04(a). Peerwani testified that a high-speed, rear-end crash, resulting in "jarring forces," could have caused "tremendous cerebral trauma," as happened to Najib and Nour. He further stated that because no one saw Najib, Hanane, or Nour conscious after the first crash, he could not definitively state that the collision with Stewart was insufficient to cause the deaths. A reasonable fact-finder could have concluded that there was a but-for link between the first crash with Stewart and Najib's, Hanane's, and Nour's deaths such that Stewart's

13

conduct was at least a concurrent cause. *See Hilburn v. State*, 312 S.W.3d 169, 175 (Tex. App.—Fort Worth 2010, no pet.); *Goode v. State*, No. 13-08-645-CR, 2010 WL 1115672, at *4–5 (Tex. App.—Corpus Christi Mar. 25, 2010, pet. ref'd) (mem. op., not designated for publication); *Quintanilla v. State*, 292 S.W.3d 230, 234–36 (Tex. App.—Austin 2009, pet. ref'd); *see also Fletcher v. State*, 317 S.W.2d 57, 58 (Tex. Crim. App. 1958) ("[T]he appellant would have this Court hold as a matter of law that there was an entire absence of any showing that the appellant's intoxication was a causative factor in the collision and death. . . . This we decline to do."); *Glauser v. State*, 66 S.W.3d 307, 313 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (op. on reh'g) (finding evidence sufficient to prove causation by defendant's intoxication because testimony showed someone in command of his faculties while driving could have avoided hitting disabled vehicle), *cert. denied*, 534 U.S. 1129 (2002). We overrule point one.

## C. FAILURE TO STOP AND RENDER AID

In his second point, Stewart argues that the evidence is insufficient to prove that he failed to stop and render aid. He contends that he did not leave the accident scene, choosing to "keep his distance from emergency personnel," and that he could not aid the family because he could not safely cross the highway.

A person commits the offense of failure to stop and render aid if he operates a vehicle involved in an accident that results in the injury or death of another person and he fails to stop and determine if the person requires aid.

14

*See* Tex. Transp. Code Ann. § 550.021(a), (c). The evidence shows that Stewart checked his truck for damage after the crash, ran from his truck when police officers arrived, and hid himself in a nearby stand of trees. Viewing the evidence in the light most favorable to the prosecution, we conclude that a reasonable fact-finder could have determined beyond a reasonable doubt that Stewart failed to stop and render aid after the crash. *See Gipson v. State*, No. 02-14-00349-CR, 2016 WL 279358, at *10 (Tex. App.—Fort Worth Jan. 14, 2016, pet. ref'd) (mem. op., not designated for publication); *Perez v. State*, Nos. 04-01-00552-CR, 04-01-00553-CR, 2003 WL 183655, at *3 (Tex. App.—San Antonio Jan. 29, 2003, pet. ref'd) (mem. op., not designated for publication), *cert. denied*, 543 U.S. 843 (2004); *Smith v. State*, Nos. 03-99-00240-CR, 03-99-00241-CR, 2000 WL 962751, at *3 (Tex. App.—Austin July 13, 2000, pet. ref'd) (not designated for publication); *Allen v. State*, 971 S.W.2d 715, 717–19 (Tex. App.—Houston [14th Dist.] 1998, no pet.). We overrule point two.

### III. SENTENCE PROPORTIONALITY

In his third point, Stewart argues that his sentences were disproportionate to the offenses and were unconstitutionally cruel and unusual. However, Stewart failed to object to the trial court's imposition of sentence at the time it was imposed[5] and did not argue with any specificity in either of his motions for new

---

[5]When the trial court asked if there was "any legal reason that sentences should not be formally imposed at this time," Stewart's counsel stated that there was "no legal reason."

15

trial that his sentence was disproportionate and unconstitutional. Thus, he has procedurally defaulted this claim.[6] *See* Tex. R. App. P. 33.1(a)(1)(A); *Sample v. State*, 405 S.W.3d 295, 303–04 (Tex. App.—Fort Worth 2013, pet. ref'd). We overrule point three.

## IV. CONCLUSION

Having overruled Stewart's points, we affirm the trial court's judgments. *See* Tex. R. App. P. 43.2(a).

PER CURIAM

PANEL: GABRIEL, J.; LIVINGSTON, C.J.; and SUDDERTH, J.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: June 6, 2016

---

[6]Even if properly preserved, this argument would have no merit because the sentence was within the range of applicable punishments and was not grossly disproportionate to the underlying offenses. *See, e.g.*, *Padilla v. State*, Nos. 2-09-247-CR, 2-09-248-CR, 2-09-249-CR, 2-09-250-CR, 2010 WL 2555212, at *1–3 (Tex. App.—Fort Worth June 24, 2010, no pet.) (mem. op., not designated for publication); *Baldridge v. State*, 77 S.W.3d 890, 893–94 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).